LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment in pertinent part as follows:
“JAMES WADE JONES, ..., did intentionally receive, retain, or dispose of stolen property, to-wit: a 1972 Datsun automobile, VIN # HLS3046678, the property of Linda Gardini, of the value of Three Thousand and No/100 ($3,000.00) Dollars, knowing that it was stolen or having reasonable grounds to believe it had been stolen and not having the intent to restore it to its owner, in violation of Section 13A-8-17 of the Code of Alabama.”
Some of the lengthy testimony in the case as shown by the court reporter’s transcript tends to be confusing, which we think is largely by reason of the fact that there is testimony relative to a silver 1972 Datsun 240Z as well as considerable testimony relative to a black 1976 Datsun 280Z, as well as to other vehicles, and because of the fact that one of the witnesses for the State testified as to his participation in trades or sales of other motor vehicles and that in doing so he had used the alias of Paul Lewis, although his true name is Zachery Lee Smith. We quote from his testimony on cross-examination as follows:
“Q. Do you have any proof that your true name is Zachery Lee Smith? Do *216 you have any proof of that other than what you are telling them?
“A. No, because all my stuff was taken over at the jail. At the jail I have my driver’s license and everything.
“Q. I’m asking you do you have anything here today?
“A. No, sir, I don’t.
“Q. So your name could be Paul Lewis; right? That’s the name you used for a number of years, wasn’t it?
“A. My alias name, yes, sir.
“Q. You used that for several years, didn’t you?
“A. Yes, sir.
“Q. And you are what is commonly referred to as a professional thief, aren’t you?
“A. Yes, sir.
“Q. And how old are you?
“A. Thirty-three.
“Q. Okay. You are thirty-three. How long have you been a professional thief?
“A. That’s hard for me to say.
“Q. Ten years?
“A. Ten. Maybe ten, I’m not sure.
“Q. Maybe fifteen?
“A. I don’t know what you call a professional thief.
“Q. How long have you been stealing?
“A. Ever since I was fourteen years old.
“Q. All right. And when were you brought to Hamilton today — when were you brought to Marion County to Hamilton?
“A. Sunday night.
“Q. Who brought you here?
“A. Deputy.
“Q. Deputy Sheriff here?
“A. Yes, sir.
“Q. And from where did he bring you?
“A. Homewood City Jail in Birmingham.
“Q. Now, you are now serving a sentence for what?
“A. Interstate transportation of stolen cars and theft of interstate shipment.
“Q. Where are you serving this sentence?
“A. I’ll be serving my sentence in Tallahassee, Florida. I have been designated there from the Regency out of Atlanta, Georgia. I am presently in the Home-wood City Jail.”
As an illustration of how confusing some of the testimony is by reason of the various automobiles referred to in the evidence, we now quote from the direct examination of Dr. Dale Erskin Bolt, a dentist in Hamilton, Alabama, a witness for the the defendant:
“Q. Doctor, do you fly airplanes?
“A. Yes, sir.
[[Image here]]
“Q. Do you know Mr. Wade Jones there?
“A. Yes, sir.
“Q. How long have you known him?
“A. I guess since about four years I reckon. I forget exactly how many years.
[[Image here]]
“Q. Your association with him has been in the flying field?
“A. Yes, sir. He was my instructor, and you know, Buddy through that, I guess.
“Q. Dr. Bolt, do you remember seeing a Datsun car — I may have the dates mixed up — there is two cars involved here, one that involves the month of December, ’81, and the other June of ’82.
“MR. TIDWELL [District Attorney]: I believe that’s possibly right, Bill.
“Q. Now, are you familiar — did you see— we’ll call it the December ’81 car?
“A. Yes, sir.
“Q. Do you recall what kind of car it was?
“A. I remember it now. It was a Datsun Z car.
“Q. Was it a you know, I’m so ignorant about these cars — was it a sports car?
“A. Yes, sir. It’s like a sports car. It’s pretty peppy and it goes pretty fast. It’s a good little car.
[[Image here]]
*217 “A. He bought it somewhere or other and as I understand it out of Birmingham. And I guess I first saw it in Hamilton.
[[Image here]]
“A. He told me he had bought the car and I believe he was going to buy it and fix it up. He was going to paint it up. It was kind of ragged looking.
“Q. Did you drive the car any yourself?
“A. Yeah, I did one time. I dropped a clutch on it.
“Q. You dropped a clutch?
“A. I was driving down the road and I was thinking about getting one myself, which I ultimately did. I was driving on Munsingwear Road seeing what it was like and the clutch started slipping so I had clutch trouble when I was driving the car.
[[Image here]]
“Q. Did you — I know you weren’t looking right at him every day but did you casually observe what use, if any, Mr. Jones made of this car after he got it?
“A. Well, he drove it like anybody else would drive a car to and from the airport and where else he had to go, if that’s what you mean.
“Q. Is it correct that after he purchased it he kept it about eleven months or something like that, or do you know?
“A. It was quite some time, eleven months would probably be about right.
“Q. Where did you say Mr. Jones works?
“A. He’s an — he works at the airport since he’s a pilot and that’s where his business pretty much is.
“Q. And he instructs and teachers [sic]?
“A. Yes, sir.
“Q. And he’s also a commercial pilot, hauls passengers and freight?
“A. Yes.
“Q. Now, I’m not suggesting anything just trying to see, you may not know; but, Mr. Jones purchased another Datsun during the month of June of 1982, did you ever see that car?
“A. Yes, sir.
“Q. Where did you see it?
“A. I don’t recall if I actually drove that one or not but I think it was runable. I saw it around. At one time he had it at his apartment and another time he had it parked at his place of business.
“Q. You don’t recall driving that one yourself?
“A. I don’t recall whether I did or didn’t. At one time I think I loaded my three kids in the back for something or other. I don’t know.
“Q. And this first car I mentioned, the one you said you dropped the clutch on, did you see anything on the inside of that car, anybody’s name on it or plaque or anything?
“A. Well, I think that was the one Wade had him a little plaque made and put on the car and said it was his car. He was proud of that car.
“MR. FITE: I believe that’s all. Answer Mr. Tidwell’s questions.
“CROSS-EXAMINATION
“BY MR. TIDWELL:
“Q. Doctor, or course, you and Wade are pretty good friends?
“A. Yes, sir_
“Q. When you first saw these cars, did you see that first car that he bought while it was down at Drandell Warren’s?
“A. I don’t honestly recall whether I did or not.
“Q. You never did see it before it was painted then?
“A. I honestly don’t remember that.
[[Image here]]
“Q. He had told you that he was going to get one?
“A. I would imagine he did.
“Q. What did he tell you about it?
“A. That he had been shopping around and looking in these car papers that come out every week.
*218 “Q. Did he tell you specifically that he had bought one or negotiated for one?
“A. I don’t recall if he said he had bought one or was going to buy one- or what.
“Q. Did he — in fact, he said he had found one?
“A. I’m not trying to be smart. I just don’t remember. I remember that he bought the car.
“Q. I guess I misunderstood you while ago when you stated that you remember he told you that I’m groping for the word that you used; do you remember what word you used, doctor?
“A. What word I used?
“Q. Yes, I few minutes ago. I remember he told me that he was getting one.
“A. Yeah. That’s what I said.
“Q. So by getting you don’t mean — did he tell you specifically what kind he was getting?
“A. I think he had his heart set on a Z car.
“Q. What kind of Z car, did he tell you that?
“A. Just a Datsun Z car.
“Q. Did he tell you where he was getting it?
“A. I think he was going to get one out of Birmingham or something but this has been a long time ago. He had shopped around for quite a while looking.
“Q. Did he ever meet that big black fellow?
“A. I don’t remember. At one time I was going to buy a car from that guy.
“Q. Is that right.
“A. That’s so.
“Q. Who introduced you to him?
“A. I forget the details but since Wade had bought the first car and then another car and I was shopping around thinking I might want a car.
“Q. Who introduced you to him?
“A. I suppose it would be Wade.
“Q. You say Wade took you down there and introduced you to this fellow?
“A. No. He told me there was a car available.
“Q. What kind of car was it?
“A. It was a Z car.
“Q. How did he tell you to get ahold of this guy?
“A. You never could. That’s why I never bought the car. I came probably that close to buying it if it’s what they said it was.
“Q. You say he was always in and out, who do you mean by ‘he’?
“A. The guy in Birmingham. The story would be simplified by saying that I was going to buy the car if it was what they said and what they told me that it was available. It was a repo or something and I was shopping around.
“Q. I guess what I’m asking is how did you get up with Lewis or Smith — what was his name now?
“A. I don’t know. I have heard about six names he used now.
“Q. What I’m asking is what name was given to you by Wade as to how to get ahold of him?
“A. I wasn’t really sure. I mean, I have shopped around so much.
“Q. But what, doctor, you said Wade put you in touch with this fellow. I mean, I’m sure the jury is interested in that.
“A. I’m trying to tell you.
“Q. How did you get in touch with him?
“A. How did I get in touch with Lewis?
“Q. Yeah.
“A. I never.
“Q. There is a limited number of ways is what I am saying. You either called him on the telephone or you got in the airplane and flew down there and there is no way to go by boat.
“A. It was all by telephone.
“Q. Did you call him or did he call you?
“A. I forget.
*219 “Q. Do you recall if Wade ever stated his name to you?
“A. I think the name was Lewis but I don’t know.
“Q. Did you ever see this fellow?
“A. I don’t think I ever laid eyes on him before today.
“Q. When did you learn he was black as opposed to red?
“A. Well, that subject comes up around here.
“Q. Who mentioned that to you?
“A. I think someone said he was a colored fellow just in conversation.
“Q. Was that while you were contemplating buying a car?
“A. I guess it was, yeah.
[[Image here]]
“Q. Doctor, you bought — you say you finally bought. What kind did you buy?
“A. I bought a turbo ZX.
“Q. What is that?
“A. Same thing. A little different motor in it.
[[Image here]]
“Q. Now, what — do you recall where you purchased your car?
“A. I bought mine from Jasper.
[[Image here]]
“Q. Let me ask you something: when you first saw that silver car, the second car, that Wade bought just kind of describe it for the jury, if you will?
“A. I think he paid more than it was worth is what I think but I’m not a mechanic.
“Q. But describe it.
“A. I’m sorry. I reckon it was ratty looking. It needed some upholstery work and new paint job.
“Q. What about the doors? Say you drove it, did the ignition work on the thing?
“A. I don’t remember.
“Q. You don’t know if the ignition had been pulled?
“A. I never pulled any ignition. I wouldn’t know, I mean.
[[Image here]]
The cross-examination of Dr. Bolt continued in the same tenor for about three more pages, which we omit. We resume by quoting the latter part of his testimony on cross-examination and his testimony on redirect examination:
“Q. When you bought yours you had a lot better reason to be cautious about it, didn’t you?
“A. Well, I would have hated to buy a car and be sitting where Wade is sitting right now.
“Q. You say you never did talk to the black fellow Smith?
“A. I don’t recall that I had any direct conversation with him.
“MR. TIDWELL: Thank you, doctor.
“MR. FITE: Can he be excused. I think my wife may have another dental appointment.
“MR. FITE: Could I ask him about reputation?
“MR. TIDWELL: Sure. Go ahead.
“REDIRECT EXAMINATION
“BY MR. FITE:
“Q. Dr. Bolt, you say you have known Mr. Jones about four years?
“A. Yes, sir.
“Q. Do you know his general reputation in the community here in Hamilton?
“A. Yes, sir.
“Q. Would you say it’s good or bad?
“A. I would say pretty good.
“MR. FITE: Thank you.
“MR. TIDWELL: That’s all I’ve got. “THE COURT: You may step down. Thank you.
“MR. TIDWELL: Thank you, doctor.
“THE COURT: Ladies and gentlemen, you have been in your seats about an hour and forty minutes now. It’s twenty-five until five so we won’t have time to have a break and start back so we’ll knock off for the day.”
*220 Twenty-five witnesses testified on call of defendant. The testimony of most of them was short, consisting chiefly of statements as to the general reputation of defendant where he lived, which the witnesses said was good. At the conclusion of their testimony, the defendant himself took the stand. His testimony consists of about one hundred transcript pages. He testified that he had been engaged in making his living “by flying airplanes or something related to that” for approximately seventeen years. He said also he gives “biannual flight reviews to students, to private pilots and commercial pilots, anything that I hold a rating for I can give that examination on a biannual basis,” that he had a certificate from Federal Aviation Administration. He said that he operated under the name of Shane Aviation Incorporated, which corporation he owned, and that he operated the business at Marion County Airport. He said that he had become very much interested in automobiles, that he had an acquaintance and friend by the name of Drandell Warren, who operated an automobile “body shop” at Hamilton. We quote from his testimony as follows:
“Q. Do you remember about when you had the first conversation [with Mr. Warren] about an automobile?
“A. Sir, he repaired two automobiles for me that were in accidents previous to that and I have had different occasions to speak with him. On two times I have done business with him. He repaired a Comet for me that my nephew had wrecked and he repaired a Volkswagen for me that I hit a German shepard with.
“Q. At the time you and he had this conversation about a Datsun, whatever it is, car, or some type of car, who initiated the conversation about that car? Did he mention it to you or did you mention it to him?
“A. I mentioned it to him.
“Q. Tell the jury what you said to him.
[[Image here]]
“A. I had been involved in a civil suit like was stated previously and was awarded compensation for damages that I had received. And I knew that I had this money coming to me and I asked Drandel to shop for a car for me. I wanted to buy a Z and he was in contact with insurance companies constantly on damaged cars and I was hoping to get one at a fairly reasonable price. I told him how much I wanted to spend and what kind of car I wanted.
“Q. Did you specifically tell him that you were interested in a Datsun Z?
“A. Yes, sir.
“Q. What, if anything, did he say to you in response to the desire that you expressed to him concerning this car?
“A. He had some kind of a little sports car but it was an older one and he — well, he tried to sell it to me, that he would do some work on it and fix it up and sell it to me but I was only interested in one kind of car at that time.
“Q. After you expressed desire to purchase or procure a Datsun Z car with Drandell Warren, did he contact you or did you contact him after that reference to such a car?
“A. He called me once that I can recall, the first time that I had knowledge pertaining to a car that he bid that had been in an auto accident. And he said he might be able to get the car for fifteen hundred, in that neighborhood, and it had been wrecked and would probably cost me — the way he talked to me however it cost to fix it back up if he did the work, that it would be all he would add to it. And I called him, or went down there, I’m not sure exactly which. I had seen him on different occasions. I asked him if he had heard from the insurance company. I did that on two or three occasions.
“Q. And he said, no?
“A. Yes, sir.
“Q. After these conversations did you or he contact each other about a Datsun Z car?
“A. I believe on one of the occasions I asked him about it he said he knew another fellow that he had also asked to shop for me. He said there was a fellow *221 that he knew that dealt in automobiles, repo’s, and this sort of thing and he traveled all over the country, up north he would buy them and bring them down here.”
The defendant continued to testify as to his contacts with Mr. Warren, which testimony covered several pages of the court reporter’s transcript, and then defendant testified that Mr. Warren called him to let him know that the car he had been looking for, the particular car described in the indictment in the instant case, had arrived, and that defendant then went to Drandell’s shop. His testimony continued as follows:
“Q. Now, when you arrived at Drandell Warren’s place, what, if anything, did you see?
“A. I saw the car.
[[Image here]]
“Q. When you arrived there that afternoon you say you saw the car there; what kind of car did you see?
“A. I saw a Datzun Z, a grey one.
“Q. Was that the same type of car that you had been looking for to purchase?
“A. Yes, sir.
“Q. And you saw the car, of course— did you see anybody else there?
“A. Yes, sir.
“Q. Who did you see?
“A. Well, Mr. Lewis [the man who had been identified in the testimony as previously shown in this opinion as Zachery Lee Smith and otherwise as Paul Lewis] and Mr. Warren and there was two or three employees that were working on automobiles.
[[Image here]]
“Q. So when you got there did a conversation ensue between you and some of these other people among you and Dran-dell Warren and Paul Lewis, the large black man?
“A. No, sir. I had a conversation with Drandell Warren.
[[Image here]]
“Q. Now, after you looked over the car, did you talk with Drandell or Lewis or either one tell what the price of it?
“A. No, sir. Drandell Warren and I — I wanted to hear the car run. Drandell Warren and I got in the car, started it up and headed south out of town driving it because he said that it wouldn’t smoke or steam until it got warm. And we went maybe a mile or so south. We went across a bridge and I think turned around by that first store and then came back and went out to the airport. I went past DrandelPs and turned and went to the airport.
“Q. What were you doing out there?
“A. I was hoping to see J.W. to have him look at it but I didn’t see him.
[[Image here]]
“Q. What did you do then?
“A. We got in the car and discussing it and I said, does he know what’s wrong with it. And he said I don’t think so. He just knows it’s smoking. And I said, how much do you think we could buy the car for?
“A. How much do you think you can buy the car for?
“A. I said, ‘we’ but I meant me. But he was dealing for me on the car and he said he didn’t know.
[[Image here]]
“Q. Did you have a conversation then with Paul Lewis about purchasing that car?
“A. I never mentioned any price with Paul Lewis. I went back inside and on the way back Drandell and I were discussing what we would offer him for the car. And I was going to offer — or Dran-dell and I said why don’t we offer him twenty-five hundred for the car. I’m not dead certain on that but it was less than what I paid for it. And I was — I walked back inside of the building after we got out of the car and Drandell talked with him and he said he wouldn’t take less than twenty-eight hundred dollars.
“Q. Said he wouldn’t take less than twenty-eight hundred?
“A. Yes, sir.
“Q. He went over and talked to who?
“A. The black fellow.
*222 “Q. All right. I forgot what you told me before that. What did you say about Paul Lewis?
“You said you went out there, did you and him get in any discussion about price? You were asking him about the car?
“A. No, I had told Drandell after he came in and told me he wouldn’t take less than twenty-eight what he thought of that and he said, I think I’ll buy it if you don’t because I don’t think it’s going to cost that much to fix it. And I said, No, I like it. I did like the car. It had black interior and I wanted to paint the outside black. And I told him I would take it.
“Q. Who did you tell?
“A. Drandell.
“Q. How much did you tell him you would pay for it?
“A. He said he wouldn’t take nothing less than twenty-eight and I said I would give him twenty-eight.
“Q. Did you have a discussion with Lewis himself about you purchasing the car?
“A. Yes, sir.
“Q. Tell the jury what that discussion was, what he said and what you said about you purchasing this Datsun car from Lewis?
“A. By this time the banks were closed.”
From that which we have quoted above, the defendant continued his lengthy testimony, which we endeavor to summarize by stating that on account of the fact that the banks were closed at the time and that Paul Lewis wanted some of his money, at least five hundred dollars of the twenty eight hundred dollars that had been agreed upon as a purchase price, and “didn’t want to leave the car without earnest money of some kind,” which defendant borrowed, some of it from J.W. Evans and the other from Drandell Warren, which Zachery Lee Smith, alias Paul Lewis, received and kept when the trade was closed between him and defendant and appropriate papers had been executed accordingly.
The court reporter’s transcript shows that the first law officer to locate the 1972 Datsun 240Z that had been stolen from Linda Gardini in Huntsville was Officer B.A. Richardson of the Auto Theft Division of the Alabama Department of Public Safety. He testified that he first met and interviewed defendant in mid-November 1982, at which time the automobile being driven by defendant was a black 1976 Datsun 280Z. Officer Richardson proceeded to testify in detail as to the condition of the black 1976 Datsun 280Z, that it had the I.D. number drilled out and the VIN plate for a Datsun 210 substituted. Officer Richardson testified that defendant told him that he had bought both automobiles from the man who had gone by the name of Zachery Lee Smith and by the name of Paul Lewis.
We now proceed to discuss the issues, five in number, presented in brief of counsel for appellant.
I
This issue is captioned in brief of counsel for appellant as follows:
“A WITNESS WAS ALLOWED TO TESTIFY FOR THE STATE OVER OBJECTION OF THE DEFENDANT REGARDING EVENTS OF WHICH THE WITNESS HAD NO PERSONAL KNOWLEDGE, SAID TESTIMONY BEING BASED ON ASSUMPTION ONLY.”
Immediately after the caption as stated above, appellant’s counsel commences the following argument:
“During Rebuttal Evidence presented by the State, Mr. James E. ‘Eutaw’ Harper was called as a witness. (R-569, 570). He was eventually asked by the District Attorney about going some place with Drandell Warren (a Co-Defendant): (R-578)
“ ‘Q. What was the purpose for going up there?
“ ‘MR. FITE: We object to this. It’s not apparent. This was not done in the presence of the defendant and not *223 in rebuttal. Proper predicate hasn’t been laid.
“ ‘MR. TIDWELL: I think it would be tied up.
“ ‘THE COURT: Overruled.
[[Image here]]
“ ‘Q. What was your purpose for going up there?
“ ‘A. It wasn’t my purpose really. It was the other fellows’. They went to get the VIN numbers.
“ ‘Q. And was that done?
[[Image here]]
“ ‘A. Apparently it was. It showed up later.’
“At this point Mr. Fite, the defense attorney, again objected to such rebuttal evidence because no direct testimony had been elicited in either the State’s or Defendant’s case that the Appellant participated in or knew about such activity. “Furthermore, it is painfully obvious from the witness’ answers that he was not present during the activity in question. As he stated: ‘It wasn’t my purpose really. It was the other fellows’... ’ And later in response to a question of ‘Was that done?’ he responded: ‘Apparently it was. It showed up later.’ (R-579)
“A very elementary principle of evidence is that in order to be allowed to testify to certain facts, the witness must have had an opportunity to observe the facts to which he testifies and have actually observed them. Gamble, McElroy’s Alabama Evidence § 105.01 (3rd Ed.)”
In the transcript, the following is shown immediately after that which we quoted above from brief of counsel for appellant wherein he quoted from the transcript that Mr. Harper testified, “Apparently it was. It showed up later”:
“MR. TIDWELL: Go ahead and answer.
“A. We went up to my house.
“Q. What was your purpose for going up there?
“MR. FITE: We object to what his purpose. That calls for a mental operation.
“THE COURT: Ask what they did.
“MR. TIDWELL: Well, Your Honor, he can state what his intent was, his own intent. Not the intent of some third person; but, he can state his intent.
“MR. FITE: I think he’s limited to what he did.
“MR. TIDWELL: He can testify to what his personal intent was, purpose for going up there. You can testify to your own mental operation.
“THE COURT: Overruled. Go ahead.
“Q. What was your purpose for going up there?
“A. It wasn’t my purpose really. It was the other fellows’. They went to get the VIN numbers.
“Q. You took Drandell Warren up there to get the VIN number off of that?
“A. Yes, sir.
“Q. By VIN number, you are talking about to get the plate off of that?
“A. Yes, sir.
“Q. And registration number?
“A. Just the plate.
“Q. And was that done?
“A. Apparently it was. It showed up later.
“Q. Where did it show up?
“MR. FITE: We object to that, Your Honor, proper predicate hasn’t been laid, not shown that any of this was done in the presence of this defendant. The defendant was not asked about this, proper predicate hasn’t been laid.
“THE COURT: Overruled.
“Q. You say it showed up later?
“A. Yes.
“Q. Did it show up on that Datsun Z in the paint shop?
“MR. FITE: We object to him leading his witness.
“THE COURT: Sustained, don’t lead.
“Q. Where did it show up?
“MR. FITE: We object to where it showed up.
“A. Ended up on the car, the one Wade Jones had.
“Q. That Z car?
“A. Yes, sir.
*224 “Q. Is it the same car that was there in that body shop?
“A. Yes, sir, I think so.
“Q. And again the day this was done was the day after the car first came to that—
“A. The next day.
“Q. It was after ‘Big Red’ had already left, wasn’t it?
‘.‘A. I had never seen him before after the day he left.
“Q. Now, that Z car that was there in that shop, did you ever have an occasion to do any work on it?
“A. Yes, sir.
“Q. What kind of work did you do on it?
“A. Put a windshield in it.
“Q. Did you do any other kind of work on it?
“A. Right door lock.
[[Image here]]
“Q. Did you replace a lock?
“A. Yes, sir.
“Q. What was the reason for replacing that lock?
“MR. FITE: We object. That calls for a mental operation as to the reason.
“Q. Did somebody tell you to put a lock on it?
“A. Yes, sir.
“Q. Who told you?
“A. Drandell.
“Q. Did you try the key that was — the key on that car in that lock prior to replacing the lock?
“A. No, sir.
“Q. What was the purpose of replacing the lock?
“MR. FITE: We object to the purpose. Calls for a mental operation.
“Q. Do you know why the lock was changed?
“MR. FITE: We object.
“A. No, sir. I was just asked to put a lock in it.
“Q. And you did?
“A. Right.
“Q. Did you do any other work on the car?
“A. No, sir.
“Q. Were you around there when the work was done on the car?
“A. They were — car sat there for a while. It was painted and, you know, other things done to it, dents took out, painted, and what-have-you.
“Q. Generally refurbished?
“A. And the engine was fixed.
“Q. Do you recall what was done to the engine?
“A. No, sir, I don’t.”
We have difficulty in concluding what particular ruling of the court constitutes the target of the first issue presented by appellant, but we believe that it probably was the overruling of defendant’s objection to the inquiry by the State of the witness, Mr. James E. Harper, as to “The purpose for going up there.” We have quoted herein-above all of the transcript that seems to shed any light upon that question. We conclude from it that the trial court was correct in overruling the objection of defendant to the inquiry by the State of the witness Mr. James E. Harper as to the intent or purpose of Mr. Harper in going with Mr. Drandell Warren to look at the motor vehicles, particularly the motor vehicle described in the indictment in this case and another motor vehicle that according to the undisputed evidence had been stolen by Zachery Lee Smith, alias Paul Lewis. To hold that a witness cannot state his uncommunicated intention or purpose would be inconsistent with what was held in Starr v. Starr, 293 Ala. 204, 301 So.2d 78 (1974), as to which Dean Gamble in Gamble, McElroy’s Alabama Evidence (3rd edition 1977), § 102.07(3), aptly states:
“Some thirty-four years after Judge McElroy's stinging criticism related in an earlier subsection [Admissibility in Alabama of a Witness’ Testimony to His Own Intent or Other State of Mind, 1 Ala. Lawyer 221 (1940)] put an end to the so-called Rule of Exclusion. The Court held that a witness now may testify on direct examination to his intention, *225 motive or other physically unexpressed mental state, provided that the testimony is material to the issues in the case [citing in the footnote Starr v. Starr].”
II.
The second issue presented in brief of counsel for appellant is as follows:
“THE PROSECUTOR’S CLOSING ARGUMENT WAS IMPROPER BECAUSE HE WAS ALLOWED TO BOLSTER HIS OWN WITNESS’S TESTIMONY BY VOUCHING FOR THE WITNESS’S CREDIBILITY.”
Appellant’s counsel directs his argument as to the issue now under consideration to the following statement made by the District Attorney in his closing argument:
“I want to set the record straight. I don’t appreciate it — Bill Richardson does a real good job. He works hard. ... And I take offense to Mr. Fite wanting to try the officer in this case. All he’s doing is his job. And you know it’s pretty hard for these witnesses — you are at a disadvantage when you are a witness in a case.” (R-607, 608).
Counsel for appellant also directs the argument in support of this issue to the following portion of the argument to the jury of State’s counsel:
“I don’t care if it’s Zachery Lee Smith or ‘Big Red’ or Wade Jones or anybody else in Marion County or Winston County. If there is enough evidence and there is probable cause to believe that that individual has committed a crime and we have a professional investigator from the Alabama Bureau of Investigation that indicates to me that he would like this case presented to the grand jury and I don’t care if everybody in Hamilton doesn’t like it, I held up my right hand and I swore that I would uphold the laws of the State of Alabama when I took this office.” (R-605).
As to the part of the argument of counsel for the State first quoted above, we are unable to find therein that counsel for the State was endeavoring “to bolster his own witness’s testimony by vouching for the witness’s credibility.” Counsel for appellant argues also that counsel for the State “intended to bolster investigator Richardson’s testimony” by the second part of his closing argument quoted above. Although we decline to approve expressly this particular argument of the District Attorney, we do not believe he was thereby vouching for the credibility of the particular witness.
We are not persuaded that this issue contained in brief of counsel for appellant is well taken.
III.
Counsel for the respective parties are in disagreement as to whether the trial court was in error in limiting the number of character witnesses that defendant’s attorneys could call in his behalf. However, there is no disagreement between them as to whether the trial court did limit the number of such character witnesses. Furthermore, the court reporter’s transcript shows that immediately before the testimony of one of the character witnesses commenced, the following occurred in open court:
“MR. FITE: Judge, some other witnesses have shown up. Can I tell them they are not supposed to be in the courtroom?
“THE COURT: They can stay in here. They are not going to testify. You have had enough anyway. You know there is a limit on character witnesses — the Court can impose limits on character witnesses and you have enough already.”
Respective counsel for both of the parties on appeal cite cases in support of their clients as to this issue, cases cited in Gamble, McElroy’s Alabama Evidence, § 10.06 (3rd ed. 1977), which states:
“The discretionary right of the trial judge to limit the number of witnesses would appear, according to the decisions of the Alabama Court of Appeals to be inapplicable to witnesses called to testify to one’s character in a criminal trial. These decisions do acknowledge, how *226 ever, the limiting of character witnesses when one’s character is not disputed.”
In the brief of counsel for appellee is the following:
“In the present case the Appellant called some eighteen character witnesses who testified as to his good reputation. (R.301-345) The prosecution cross-examined Appellant’s character witnesses but did not counter with any character witnesses of its own. Therefore, the Appellant had ample opportunity to introduce his ‘good character’ to the jury, and did so. The Appellant suffered no prejudice due to the trial court’s refusal to allow additional character witnesses to be called and thus no reversible error occurred.”
We are unable to say with certainty whether each of the last two sentences of the argument of counsel for appellee as just quoted is correct, but we think we should note that most of the large number of witnesses who testified on call of the defendant were questioned as to his reputation and responded to the effect that his reputation was good. We also note that substantially all of said witnesses testified on direct examination as to matters other than the general reputation of defendant. In our opinion, the trial court was in error in its ruling limiting the number of character witnesses that defendant’s attorneys attempted to call to the stand to testify on behalf of defendant.
IV.
This particular issue is thus captioned in brief of counsel for appellant:
“REVERSIBLE ERROR OCCURRED WHEN THE PROSECUTION WAS ALLOWED TO CROSS-EXAMINE DEFENSE CHARACTER WITNESSES ON UNSUBSTANTIATED RUMORS.”
During the cross-examination of one of the female character witnesses who testified in favor of defendant, she was asked whether she had “heard any reports or rumors about him [the defendant] being involved in the drug business or anything like that.” The inquiry led to a motion for a mistrial by defendant’s attorney, the hearing of which motion was conducted out of the presence of the jury and which terminated as follows:
“MR. FITE: Can you bring live witnesses up here to that? Can you?
“MR. TIDWELL: I can bring live witnesses to show that there have been reports or rumors.
“MR. FITE: I see. That’s all you have ever had.
“MR. TIDWELL: And, in fact, such warrants have been issued, Judge.
“MR. FITE: And you have been down at the airport and searched him yourself and you didn’t find anything.
“MR. TIDWELL: No, sir. I didn’t search him myself.
“MR. FITE: You met him at the airport when he came in with his plane?
“MR. TIDWELL: Your Honor, I’m not going to get into any more argument with Bill.
“(Recess.)
“THE COURT: Overrule the defendant’s last motion for a mistrial. It is denied.”
We are unable to state with reasonable certainty that the trial court was in error in not granting defendant’s motion for a mistrial. Nevertheless, we are of the opinion that the bringing to the attention of the jury during the trial of the case rumors and reports of the defendant having been engaged in the drug business is a factor to be considered in favor of appellant in connection with the determination we have herein-above made that the trial court was in error in limiting the number of character witnesses to testify on behalf of defendant.
V.
The last issue presented by appellant is captioned as follows in brief of counsel for appellant:
“INADMISSIBLE HEARSAY TESTIMONY WAS ADMITTED INTO EVIDENCE TO PROVE THE THEFT OF ONE AUTOMOBILE PURCHASED BY APPELLANT.”
*227 The “ONE AUTOMOBILE” referred to in the caption of this issue in brief of counsel for appellant was not the automobile identified in the indictment in this case. In arguing this issue, counsel for appellant states, “Mr. Richardson was also allowed to testify that he identified the 280Z through a computer ‘print-out’ showing that it was a ‘hit’; a stolen vehicle (R-88).” Counsel for appellee responds to the argument of counsel for appellant in part as follows:
“The hearsay rule applies only to a statement offered for the truth of its contents; a statement offered for some purpose other than to prove the truth of the matter asserted is not hearsay. Epps v. State, 408 So.2d 526 [562] (Ala.Crim.App.1981). Furthermore, hearsay evidence is not patently inadmissible unless it is inadmissible for any purpose. Hayes v. State, 395 So.2d 127 (Ala.Crim.App.1980), certiorari denied, Ex parte Hayes, 395 So.2d 150 (1981). Therefore,” the hearsay in question was admissible to show guilty knowledge and intent on the part of the Appellant.”
We are not convinced by the brief of either of the counsel for the parties on appeal as to the correctness of the position taken by either of them, and we will not endeavor to decide the particular issue at this time.
We are of the opinion that the material and particular circumstances of this case show that the general reputation of the defendant, whether good or bad, should and would have had a great influence upon a jury in deciding whether defendant was guilty of the particular crime charged. The judgment of guilt and sentence should be reversed and the cause remanded for another trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.
PATTERSON, J., concurring in result only.