584 So.2d 841 (1988)
Curtis Lee HENDERSON
v.
STATE.
7 Div. 523.
Court of Criminal Appeals of Alabama.
April 12, 1988.
Rehearing Denied May 24, 1988.
On Return to Remand July 21, 1989.
Rehearing Denied December 29, 1989.
Certiorari Quashed June 15, 1990.
On Return to Remand August 3, 1990.
*844 B. Greg Wood of Wood, Hollingsworth & Willis, Talladega, and Tommy R. Dodson of Machen, Redd & Dobson, Sylacauga, for appellant.
Charles A. Graddick, Atty. Gen., and Rivard Melson and William D. Little, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 89-560.
McMILLAN, Judge.
The appellant, Curtis Lee Henderson, was charged with intentionally causing the death of Willie Edward Perkins by shooting him with a pistol, after being hired by Cleveland Turner, Jr., and on an agreement that he be paid $2,000. He was found guilty of the capital offense as charged in the indictment, in violation of § 13A-5-40(a)(7), Code of Alabama (1975). The jury returned an advisory verdict recommending punishment by death and, following a separate sentencing hearing, the trial court sentenced the appellant to death by electrocution.
Following the striking of the jury, a hearing was held on the appellant's motion to quash the jury on the grounds that the prosecution systematically used its peremptory strikes to exclude black individuals from the jury. The record indicates that the appellant is black. There were fourteen black persons on the striking list and the prosecutor used his first ten strikes to eliminate black potential jurors. Thereafter he struck two more black persons. Defense counsel struck one black person who indicated that she felt the death penalty would be appropriate in cases of intentional killing. One black remained on the jury.
During the hearing, the prosecutor gave reasons for his strikes, some predicated on a "no" given by an investigator with the sheriff's department. Because of the nature of some of these reasons, this case is remanded to the trial court for a hearing to be held pursuant to Ex parte Branch, 526 So.2d 609 (Ala.1987). A record of this hearing and findings made by the trial court shall be filed expeditiously in this court following the hearing in circuit court.
For the reasons stated, this cause is remanded with directions for a hearing.
REMANDED WITH DIRECTIONS.
All the Judges concur.

ON RETURN TO REMAND
McMILLAN, Judge.
The appellant was convicted of the capital offense of murder for hire and was sentenced to death, as explained in our original opinion. The following is the trial court's findings of fact concerning the evidence and testimony presented during the trial:
"That prior to April 2, 1985, Cleveland Turner, Jr., had been having an affair with the victim, Willie Edward Perkins', wife, Christine Perkins. That Cleveland Turner, Jr., had given Christine Perkins money to go to Springfield, Ohio, and that he had planned to join her at a later date.
"Approximately 2 weeks prior to April 2, 1985, Cleveland Turner, Jr., agreed with Curtis Lee Henderson to pay Henderson $2000 when he took care of Willie Edward Perkins. That shortly prior to April 2, 1985, Cleveland Turner, Jr., gave a .38 caliber pistol to Victor Mature Henderson, the brother of the defendant, Curtis Lee Henderson, and that Curtis Lee Henderson received the gun. The.38 caliber Smith & Wesson was ultimately recovered from Curtis Lee Henderson's house by the Talladega County Sheriff's Department and was the murder weapon used in the death of Willie Edward Perkins.
"On April 2, 1985, Curtis Lee Henderson went to Cleveland Turner, Jr.'s residence and borrowed the keys to Cleveland Turner Jr.'s motorcycle. The defendant drove the motorcycle to Sycamore Church, a church near Willie Perkins' house, and parked the motorcycle. The defendant then walked to the residence of Willie Edward Perkins and knocked on his door. When Willie Edward Perkins opened the door, the defendant shot him in the head. Curtis Lee Henderson left and rode the motorcycle *845 back to Cleveland Turner, Jr.'s house and told Cleveland Turner, Jr., `you do not have to worry about the problem and I will see you tomorrow.' The defendant left and went to his home and hid the .38 caliber pistol in his bedroom, where it was ultimately removed by the Talladega County Sheriff's Office.
"On April 3, 1985, the defendant came back to the residence of Cleveland Turner, Jr., to collect his money and in fact did collect $900. After exiting the home of Cleveland Turner, Jr., the defendant, Curtis Lee Henderson, was arrested. The conduct by the defendant, Curtis Lee Henderson, constituted a brutal, aggravated, and intentional killing of a man. The murder of the victim, Willie Edward Perkins, was of the intentional type pursuant to a contract for hire committed by the defendant, Curtis Lee Henderson."

I
This cause was remanded to the trial court in order for a hearing to be held pursuant to Ex parte Branch, 526 So.2d 609 (Ala.1987). As previously noted, the prosecutor used his first ten strikes against black venire members and, thereafter, struck two more blacks. Defense counsel struck one black venire member and one black venire member remained on the jury. Although this trial occurred prior to the release of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the prosecutor had come forward with reasons for his strikes. Because of the nature of some of these reasons, further explanation and examination was required.
A thorough hearing was held, pursuant to the order of this court, during which the prosecutor came forward under the guidelines of Batson and Branch with explanations for his strikes against the 12 black venire members. The reasons he gave were as follows:
1. Celia R. Briskey: The district attorney stated that he originally considered leaving her on the jury, but his chief investigator, Frank Strickland, later informed him that she was a very good friend of a group of young men who had been prosecuted on several previous occasions.
2. Mary Curry: The district attorney stated that her husband worked for the County Road Department and Mack Cole. He further stated that Mack Cole was a county commissioner who had been indicted at the time and, although he could not recall whether the potential juror's husband was brought into the grand jury, a number of Mack Cole's employees were ultimately involved in the trial and "it was an extensive investigation into the County Commission and left a lot of hard feelings between some of the workers with the County and the D.A.'s Office." The prosecutor further noted that he had prosecuted 13 Currys during the preceding three or four years and there was, at the time, a Curry on the trial docket to be prosecuted for sale of controlled substance. Frank Strickland informed the prosecutor that Mary Curry was related to a number of the Currys that had been prosecuted.
3. Rhonda G. Debardlabon: The prosecutor stated that she was struck because her mother had been prosecuted for murder. He further noted that he would have struck a member of any race for this reason.[1]
4. Essie M. Denson: The prosecutor stated that Frank Strickland informed him that she would make a good juror and that he intended to leave her on the jury, but that, during the voir dire, she voiced a great dislike for circumstantial evidence and stated that she could not base a judgment on circumstantial evidence. He further noted that he struck a white venire member, Gordon Gibbins, for the same reason.
5. and 6. Cora F. Estelle and Maxine Estelle: The prosecutor noted that these two jurors having the same last name were also close in age. He testified that *846 he got the two potential jurors confused and decided to strike both of them out of caution. One of them might have been a co-worker with the mother of a man who was convicted of a triple murder and sentenced to death. Furthermore, one of these venire members would frown and begin to raise her hand when the prosecutor began to discuss the death penalty as a possible punishment.
7. Charlie Evans: The prosecutor noted that this potential juror had been represented by the appellant's attorney and that the appellant's attorney addressed him on a first name basis. He further noted that the potential juror wore sunglasses in the courtroom during the entire voir dire. The prosecutor stated that he would strike a member of any race for that reason. The prosecutor further stated that he struck a white male, Tommy Dobson, because he had been represented by another attorney involved in this case.
8. Althea Garrett: This potential juror answered that she had seen the appellant frequently and "around" at "the club." The prosecutor also noted that approximately 25 Garretts from that area had been prosecuted by him during the past four-year period. He further noted that several other Garretts were on the present trial docket. Frank Strickland informed the prosecutor that Althea Garrett was related to a number of the Garretts who had been prosecuted by the district attorney.
9. Ella Garrett: Frank Strickland also stated that she was related to a number of the Garretts who had been prosecuted. The prosecutor also stated that she had indicated a religious conviction against passing judgment. The prosecutor explained that he had actually indicated on his list that it was Irene Garrett with the religious conviction, but that in reviewing the record and defense counsel's notes, he determined that it was in fact Ella Garrett who had the religious conviction.
10. Irene Garrett: The prosecutor had noted on his list that she stated she could not pass judgment on her fellow man. Moreover, she had appeared as a witness for a defendant in a murder case in Calhoun County.[2] The prosecutor also stated that Frank Strickland informed him that she was related to a number of the Garretts whom he had prosecuted.
11. J.B. Garrett: Frank Strickland also stated that this potential juror was related to a number of the Garretts prosecuted by the district attorney. Moreover, J.B. Garrett was an elderly gentlemen who had difficulty hearing during the voir dire and, because the prosecutor felt that some of the critical evidence in this case involved tapes which were hard to hear J.B. Garrett might be unable to hear the evidence.
12. Mary G. King: The prosecutor stated that she had gone to school with the appellant and lived either next door or a few houses down from the man who allegedly paid the appellant to commit the murder. She indicated that she knew this man, Cleveland Turner, Jr., and his wife well.[3]
After reviewing the evidence presented at this hearing, we agree with the trial court's findings that the prosecutor came forward with sufficient reasons to show that he did not discriminate racially in his strikes against black jurors. The trial court made the following findings of fact:
"Several factors strongly indicate the credibility of these reasons. First, a number of the reasons given by the District Attorney were based on information provided to him by Chief Investigator, Frank Strickland, who is black. The Court knows Mr. Strickland personally and is aware of no reasons why he would discriminate racially against persons of his own race. The District Attorney's reason for relying on Mr. Strickland, that *847 he knew the community better because of his daily contact with it, is certainly a plausible one.
"Another reason for crediting the District Attorney's reasons is that he stated the same basic reasons for the strikes at the time of trial; his testimony on remand is mainly a further explanation of those reasons in light of Batson and Branch. This is not, therefore, a case where the District Attorney is faced with remembering reasons he had no special reason to note at the time. Furthermore, the willingness of the District Attorney to come forward with his reasons at the time of the trial, despite the lack of any compelling legal reason at that time to do so, strongly suggests that he was telling the truth both then and is so now, and the Court so finds.
"The defendant has presented evidence on a number of cases involving black defendants tried around the time of the defendant's trial. It is unclear how many of the total number of cases involving black defendants in this time frame these cases represent. While these cases show more blacks struck by the State than by the defendant, there are few cases among these where no blacks served. Moreover, the juries in a number of these cases were not struck by the District Attorney but by assistant district attorneys; while relevant, these particular cases are not especially probative on the issue here, whether there was an intent to discriminate on the part of the District Attorney himself.
"The District Attorney has in response presented evidence on a number of cases tried more recenlty. In almost all of these cases a significant number of blacks served on the jury in situations where the State could have struck all the blacks. While some of these cases involved white defendants, the Court finds that these cases also have probative value because they show the State's striking patterns are consistent with regard to both black and white defendants. These cases thus support the conclusion that the State does not discriminate racially, either in cases where there are black defendants or where there are white defendants and the Court so finds.
"Based on these factors, and also based on the Court's observance of the District Attorney's demeanor while testifying both at the trial and the remand hearing, the Court finds that the District Attorney did not discriminate racially in his strikes of black jurors in this trial."
The trial court's findings concerning the prosecutor's reasons for its strikes were proper pursuant to Scales v. State, 539 So.2d 1074 (Ala.1988). In Scales, the Alabama Supreme Court held:
"In Batson, the Supreme Court did not eliminate peremptory strikes altogether. It simply said that such strikes must not be used to discriminate on a racial basis. We appreciate that it is impossible to know what is in the mind of another person, and that it is possible that, in stating his reasons for striking a black member of the venire, a prosecutor may give a reason that is not the true reason, but we are convinced that the trial judges in our system are in a much better position than appellate judges to decide whether the truth has been stated.
"In this case, the reasons given by the prosecutor for using his strikes to eliminate these ... people were facially race neutral. The trial judge found them to be credible. No more is required under Batson...."

II
The appellant argues that the trial court erred in overruling his challenges for cause of eight veniremen who expressed convictions that all intentional killings should be punished by death. The appellant argues that this failure to exclude for cause jurors with a bias for the death penalty is reversible error pursuant to Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). While Witherspoon and its progeny established the standards for determining whether a prospective juror must be excused because he opposes the death penalty, a trial court's determination on an appellant's challenge for cause where a prospective juror appears *848 biased in favor of the death penalty should also be examined in light of the Witherspoon standard. See Witherspoon v. Illinois, 391 U.S. at 535-36, 88 S.Ct. at 1784 (Black, J., dissenting):
"[I]t is a question of plain bias. A person who has conscientious or religious scruples against capital punishment will seldom if ever vote to impose the death penalty.... In the same manner, I would not dream of foisting on a criminal defendant a juror who admitted that he had conscientious or religious scruples against not inflicting the death sentence on any person convicted of murder (a juror who claims, for example, that he adheres literally to the Biblical admonition of `an eye for an eye'). Yet the logical result of the majority's holding is that such persons must be allowed so that the `conscience of the community' will be fully represented when it decides `the ultimate question of life or death.'"
See also Adams v. Texas, 448 U.S. 38, 49, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980) ("[t]he appearance of neutrality created by the theoretical availability of § 12.31(b) [a Texas statute] as a defense challenge [against potential jurors who state that their views in favor of the death penalty will affect their deliberations on fact issues] is not sufficiently substantial to take the statute out of the ambit of Witherspoon"). See also Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), wherein the petitioner argued that where a potential juror declared that if the jury found the petitioner guilty, he would vote to impose death automatically, his motion to have the juror removed for cause was improperly denied. The United States Supreme Court analyzed this issue under the standards of Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
The United States Supreme Court, in Witherspoon, held that procedural due process forbids the exclusion for cause of a prospective juror who has mere conscientious objections to the death penalty. However, the Court also noted:
"Nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from whom the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

Witherspoon v. Illinois, 391 U.S. at 522-23, n. 21, 88 S.Ct. at 1777, n. 21. (Emphasis in original.)
In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court expounded on its holding in Witherspoon, stating:
"We therefore take this opportunity to clarify our decision in Witherspoon, and to reaffirm the above-quoted standard from Adams [v. Texas, supra] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. This standard is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with Witherspoon's reference to `automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with `unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."
Id. at 424-25, 105 S.Ct. at 852.
This issue has recently been addressed by the Supreme Court of California in People *849 v. Coleman, 46 Cal.3d 1284C, 46 Cal.3d 749, 251 Cal.Rptr. 83, 759 P.2d 1260 (1988).[4] The court stated therein:
"Although neither Witherspoon, supra, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, nor Witt, supra, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, on its face concerns exclusion of a prospective juror for cause due to his or her view favoring the death penalty, we think Witt makes clear that a challenge on the basis of bias meeting the Witherspoon standard is no different from any other challenge for cause, where the trial court is asked to determine whether the juror lacks impartiality on an issue relevant to the case. (See Witt, supra, 469 U.S. at p. 423, 105 S.Ct. at p. 852.) When the adversary seeking exclusion is the People, and the basis for exclusion is an inability to conscientiously consider all of the sentencing alternatives, Witt offers particular guidance as to when the People have shown that partiality. We conclude that the same standard of partiality would also have to be shown when the defendant asks the state to exclude a prospective juror for cause, based on a view of the death penalty. A defendant seeking to exclude a prospective juror for cause, based on the person's views of the death penalty, must therefore demonstrate that those views `would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"....' (Witt, supra, 469 U.S. at p. 424, 105 S.Ct. at p. 852; see also Ross v. Oklahoma (1988) 487 U.S. 81, 83-85, 108 S.Ct. 2273, 2276-77, 101 L.Ed.2d 80 [applying Witt in such a case].)"
46 Cal.3d at 765, 251 Cal.Rptr. at 93, 759 P.2d at 1270.
See also State v. Sloan, 756 S.W.2d 503, 505-8 (Mo.1988), cert. denied, 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1989) (wherein the trial court properly refused to strike for cause three venirepersons who initially indicated that they would impose the death penalty if the defendant was found guilty of first degree murder; they ultimately stated that they could follow the trial court's instructions and consider both the death penalty and life without parole).
In the present case, eight veniremembers expressed a belief that the death penalty should be applied to all cases in which a defendant is found guilty of intentional killing. However, each of these potential jurors was thereafter informed that, if the appellant was convicted of intentional murder with aggravated circumstances, they would have to fairly consider both life without parole and death as penalties. Each of the veniremembers then stated that his or her views on the death penalty would not prevent or substantially impair his or her ability to decide the issue of punishment in accordance with the trial court's instructions and their oath as jurors. The trial court denied the appellant's challenges for cause of these veniremembers. The trial court's ruling was made under the proper standard and was supported by the record. "[T]he question is not whether a reviewing court might disagree with a trial court's findings, but whether those findings are fairly supported by the record." Wainwright v. Witt, 469 U.S. at 434, 105 S.Ct. at 857.

III
The appellant argues that he was deprived of a fair trial and that his Eighth Amendment rights were violated, because the prosecutor stated, during voir dire examination of the jury venire, that the jury's determination of facts from disputed evidence was not a final determination. However, the record reveals that the appellant's claims concerning these statements made by the prosecutor were inaccurate, as they were taken out of context. The record reveals that the following transpired during voir dire examination:[5]

*850 "[DEFENSE COUNSEL]: What I mean is listen equally to everybody and don't make up your mind who you are going to believe until you have heard all of the evidence. That's what I'm asking. Then you will obviously have to make up your mind one way or the other or reach a verdict in the case. Can each of you promise me that you will do that, an open ear for all of the witnesses until all of the evidence has come in. The last question is a very important question. Do each of you accept the proposition that a jury verdict of guilty or not guilty, as a capital murder charge, and that is a charge that could ultimately be punished by a death penalty if found guiltythat your verdict of guilty or not guilty on that part of the offense in this case would be a final ruling by you as the jury on the weight of the evidence and what evidence is to be believed from this witness stand? And that the appeals process that we all are familiar with, laymen and lawyers alike, that might result if the Defendant in this case were convicted, that the appeals process deals only with rulings made by the Court or by the Judge and not with what the jury does in determining who they believe and who they don't believe.
"[PROSECUTOR]: Judge, I'm not going to object to that, but I object to [Defense Counsel] telling them what the law is and that the Court of Appeals doesn't rule on factual questions because that is an incorrect statement. They reverse and render cases on insufficiency to make out
"[DEFENSE COUNSEL]: Your Honor, I object to [Prosecutor]
"[PROSECUTOR]: I object to him telling the jury what the law is. That is Your Honor's job.
"[DEFENSE COUNSEL]: Well, [Prosecutor] did the same thing.
"THE COURT: Well, that question
"(Both Attorneys talking)
"THE COURT: Wait just a minute, gentlemen. Your question had about three or four in it, so if you can clarify and ask a question that I can understand and that the jury can understand, I'll let you go forward. The Court will instruct the jury as to what the law is in this case. Please remember that throughout this proceeding today if you are selected as a juror. Go ahead, [Defense Counsel].
"[DEFENSE COUNSEL]: Can each of you accept the proposition that the appeals process that may come into effect if Curtis Lee Henderson is convicted in this case, if that be done, that the appeals process deals only with legal questions and review of rulings made by the Court or the Judge in this case, Judge Fielding, and does not review the weight of the evidence. That is your determination of who to believe and who not to believe and what are the facts of the case beyond a reasonable doubt."
The appellant cites Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in which the United States Supreme Court held that it is constitutionally impermissible to rest a death sentence on a determination made by a jury which was led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rested elsewhere. In expounding on their holding, the Court noted:
"Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an `awesome responsibility' has allowed this Court to view sentencer discretion as consistent withand indeed as indispensable tothe Eighth Amendment's `need for reliability in the determination that death is the appropriate punishment in a specific case.'"
Id. at 330, 105 S.Ct. at 2640, quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).
However, defense counsel's comments made to the venire clearly concerned the jury's factfinding determinations made during the guilt phase of the trial and the prosecutor's reply was in response to that line of comment. The prosecutor's objection *851 was based on defense counsel's "telling the jury what the law is" and stating an inaccurate proposition of law to the jury. The trial court properly responded that it would instruct the jury as to what the law was in the case. Furthermore, on appeal, there is a presumption in favor of the correctness of the jury verdict. Saffold v. State, 494 So.2d 164 (Ala.Cr.App. 1986). Although that presumption of correctness is strong, it may be overcome in a limited category of cases where the verdict is found to be palpably wrong or contrary to the great weight of the evidence. Bell v. State, 461 So.2d 855, 865 (Ala.Cr.App.1984).
The prosecutor was not de-emphasizing the jury's role in determining punishment in a death case, but rather responding to defense counsel's statement to the jury that their verdict and findings as to the appellant's guilt were final and not subject to appeal. This is an incorrect statement of the law. Further, it is the trial court's duty to instruct the jury as to the law.

IV
The appellant argues that he was prejudiced in questioning a veniremember concerning her bias against consuming alcohol. Specifically, he contends that the trial court erred in limiting his voir dire examination of the potential juror as to that subject. The record indicates that defense counsel asked the panel of potential jurors whether anyone's ability to hear the evidence and render an impartial verdict would be affected if the evidence showed that the appellant had been consuming alcohol around the time of the offense. The following transpired immediately thereafter:
"JUROR EYSTER: I told you that my mother-in-law was killed. The man was drunk, and he shot her with a gun; and it's just so close, you know, that I
"[DEFENSE COUNSEL]: Do you think that if that were the evidence in the case that you might be unable to render a fair and impartial verdict and might be prejudiced against the person that drank?
"[PROSECUTOR]: Now, Your Honor, we object to [Defense Counsel] asking a juror if that were the evidence in the case. He is asking a juror to sit in on facts which are not now in evidence. I'd merely ask Your Honor to ask if considering all of the evidence in this case if they could follow their oath and listen to the evidence and render a verdict as to the law. He's asking them to sit in particular facts that are not in evidence at this time.
"THE COURT: Can you, Mrs. Eyster, render a fair and impartial verdict in this case based on all of the evidence that comes to you from the witness stand and according to the law that the Judge gives you?
"JUROR EYSTER: I believe that I can, but like I said
"THE COURT: You need to give me a yes or a no answer if you can. Can you do it, or can you not do it?
"JUROR EYSTER: Yes.
"THE COURT: Okay. Let's move on to something else.
"[DEFENSE COUNSEL]: If the evidence indicates that Mr. Henderson had been drinking you might turn against him at that point?
"JUROR EYSTER: Drinking don't have anything to do with it. It's just the
"[DEFENSE COUNSEL]: Okay, thank you."
The defense counsel then proceeded to question the entire panel on further matters. The record does not reveal that the appellant was limited in his examination of the potential juror concerning her feelings about alcohol in any manner. He was allowed to ask the potential juror if her feelings about alcohol might prejudice her against the appellant. When the potential juror indicated that it would not, defense counsel interrupted her answer. Further, the trial court elicited from the potential juror that she would be able to render an impartial verdict based upon the evidence presented.
Even if defense counsel's questioning could have been considered "limited" by the trial court, there is no indication that *852 the trial court abused its discretion or that the appellant was prejudiced.
"`The legal standard to be applied as regards voir dire questioning of the venire is the sound discretion of the court. The court determines how far counsel may go in asking questions of the jury on voir dire. The nature, the variety, and the extent of the questions are left to the trial court.'

"Dawkins v. State, 455 So.2d 220, 222 (Ala.Cr.App.1984).
"Reversal can only be predicated upon an abuse of that discretion. Edwards v. State, 452 So.2d 487, 494 (Ala.Cr.App.1982), reversed on other grounds, 452 So.2d 503 (Ala.1983); Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied, 399 So.2d 899 (Ala.1981)."
Jennings v. State, 513 So.2d 91, 95 (Ala.Cr. App.1987).

V
The appellant argues that the trial court erred in overruling his challenge for cause of a potential juror who was the brother-in-law of one of defense counsel's law partners. The appellant argues that § 12-16-150(11), Code of Alabama (1975), which deals with challenges for cause specifically in civil cases, should be applied also in his criminal prosecution. However, under the language of that Code section, even if it were to be applied to a criminal prosecution, it would not support the appellant's argument. Section 12-16-150(11) states:
"That the juror, in any civil case, is plaintiff or defendant in a case which stands for trial during the week he is challenged or is related by consanguinity within the ninth degree or by affinity within the fifth degree, computed according to the rules of civil law, to any attorney in the case to be tried or is a partner in business with any party to such case."
Thus, in order to be properly challenged for cause, the juror must be related within the required degree "to any attorney in the case." In the instant case, the challenged juror was related to a law partner of the defense counsel. That law partner was not an attorney in this case.

VI
The appellant argues that the trial court erred in admitting evidence of his extrajudicial admissions and further erred in overruling his motion for directed verdict of acquittal. The appellant specifically argues that his confession should not have been allowed into evidence because, he says, the State had failed to prove the corpus delicti of the offense and he argues that his motion for directed verdict of acquittal should have been granted on the same grounds.
In the present case, we find that the corpus delicti of the charged offense was established independently of the appellant's admissions. "Circumstantial evidence may afford satisfactory proof of the corpus delicti, and, if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. McCloud v. State, 401 So.2d 314 (Ala.Crim.App.1981); Dolvin v. State, 391 So.2d 133 (Ala.1980)." Magwood v. State, 494 So.2d 124, 149 (Ala. Cr.App.1985), affirmed, 494 So.2d 154 (Ala.1986).
Prior to the introduction of the appellant's confession, the State provided evidence through the testimony of employees of the Talladega sheriff's office, including the testimony of the sheriff, and through the testimony of employees of the district attorney's office, from which the jury could have reasonably inferred that the crime had been committed. Specifically, there was testimony that, after the victim's body was discovered, Curtis Henderson, Jr., was observed at the scene and, later that same afternoon, voluntarily went to the sheriff's office, where he was interviewed. Subsequently, Cleveland Turner, Jr., and a number of officials drove to Turner's trailer. The sheriff and another official went into the trailer with Turner. The sheriff "wired" Turner with a listening device. The receiving end of the device was in a vehicle occupied by a number of officials; thereby they could monitor the conversations *853 transpiring inside the trailer. The sheriff gave Turner nine $100 bills to pay the individual who was intended to receive the money. Turner had previously informed the officials that he was to pay $2000 for having the victim killed; however, he was unable to get to the bank and withdraw the money. The sheriff and another official, who were still inside the trailer, hid in a bedroom with a wall adjacent to the living room, in order to listen to the conversation. The sheriff also had a walkie-talkie, through which he could communicate with the outside vehicles. The officials, parked in the vehicles, were close to the trailer, and they testified that they observed two black males enter the trailer. They then monitored the conversation which transpired between Cleveland Turner, Jr., and the two individuals, as did the sheriff and other official who were listening in the bedroom. During the conversation, Turner identified the parties as "Pebbles," the appellant's nickname, and "Vic," the appellant's brother's nickname. The sheriff testified that one of the two men speaking to Turner described the way he had killed the victim and, further, told Turner where he had hidden the gun. The officials in the cars testified that, when the conversation ended, the two black men walked out of the trailer and approached the vehicle in which they had arrived. The officials drove up to the trailer, where the two men were apprehended. The two men were identified as the appellant and his brother. Nine $100 bills were found tucked inside the appellant's blue jeans. The serial numbers on the bills matched those of the $100 bills which the sheriff had given Turner to pay off the "hit man."
This testimony sufficiently established the corpus delicti of the capital offense, independently of the appellant's admission. The evidence is uncontradicted that the victim was killed by being shot through the head. Further, there was evidence to show that the victim was intentionally killed pursuant to a murder for hire. "The State having proved the corpus delicti by independent evidence, the admissions of appellant served to prove his participation in, and his guilt of, the crime for which he was convicted." Magwood v. State, supra, at 149.

VII
The appellant argues that the trial court erred in allowing the prosecutor to read Alabama's complicity statute to the jury during closing argument, because the indictment did not charge the appellant with complicity and the trial court did not subsequently instruct the jury on the law of complicity. The following transpired during the closing argument by the prosecutor:
"All right, we've got a complicity statute. I think the judge will charge you on that. This goes to part of the for hire thing. It basically says under the law it's an aiding and abetting theory, that a person is legally accountable
"[DEFENSE COUNSEL]: Your Honor, we object at this portion of the law being mentioned to the jury. We object.
"THE COURT: I'll overrule at this time.
"[PROSECUTOR]: A person is legally accountable for the behavior of another constituting a criminal offense if with the intent to assist the commission of the offense, he procures, induces, or causes such other person to commit the offense or if he aids or abets the person in committing the offense, and basically what the law says is that all persons concerned in the commission of the felony, either directly or indirectly or by aiding or abetting in the commission of the offense, are equally guilty under the eyes of the law. So, when we are out there at the mobile home, it doesn't matter who gets the money first. We know who ends up with it. All persons engaged in the commission of this felony, being the murder and the for hire aspect are equally guilty under the eyes of the law."
Despite defense counsel's opening and closing statements,[6] there was no evidence *854 presented during the guilt phase of trial to dispute the State's evidence that the appellant entered a contract for hire to kill the victim for $2000. The appellant's statement supported that contention. Further, the State presented evidence, in the guilt phase, that during the taped conversation which transpired between Cleveland Turner, Jr., the appellant, and the appellant's brother at Turner's mobile home, Turner was told to give the money to "Pebbles," "Pebbles" being the appellant's nickname. Moreover, the State introduced evidence that, when the appellant was apprehended immediately after leaving the mobile home, the $900 was found tucked in his blue jeans. The appellant presented no evidence, during the guilt phase, to dispute this evidence. Nor did the appellant ever dispute being the person who shot and killed the victim. Therefore, as there was no evidence presented to negate the State's evidence that the appellant personally committed the offense, the law of complicity was not applicable to this case and the trial court properly did not charge the jury thereon. "The oral charge must be judged within the context of the facts in dispute." Ex parte Tomlin, 443 So.2d 59, 64 (Ala.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984).
Although the prosecutor included the complicity statute in his closing argument to the jury, the error was harmless, because it did not injuriously affect the appellant's substantial rights, Rule 45, Alabama Rules of Appellate Procedure, and because it was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See Schaut v. State, 551 So.2d 1135 (Ala. Cr.App.1989). The appellant was charged by indictment with intentionally causing the death of the victim by shooting him with a pistol for hire for $2000, in violation of § 13A-5-40(a)(7), Code of Alabama (1975). That Code subsection defines the capital offense as "[m]urder done for pecuniary or other valuable consideration or pursuant to a contract or for hire." The appellant was indicted for murder for hire. As the appellant's statement indicated, and as averred in the indictment, Cleveland Turner, Jr., hired the appellant to kill the victim for $2000. The evidence of that agreement was uncontradicted by the appellant. Thus, the fact that the appellant received $900 was not necessary proof of the elements of the offense. See McCall v. State, 501 So.2d 496, 506-07 (Ala.Cr.App.1986). Therefore, any comments made by the prosecutor concerning complicity as to who received the money did not affect the appellant's substantial rights and was harmless beyond a reasonable doubt. The aggravating element of the appellant's offense was based on his motivation for committing the murder.
Moreover, the error was harmless because the trial court, as well as the prosecutor and defense counsel, informed the jury on numerous occasions throughout the trial, including just before the closing arguments, that only the trial court could instruct as to the law; whereas the attorneys' comments were merely arguments concerning the evidence. The trial court stated that he would instruct the jury as to the law, and he correctly did so. Bland v. State, 395 So.2d 164, 168-69 (Ala.Cr.App.1981).

VIII
The appellant argues that the trial court erred in overruling his objection to the prosecutor's statement, made during his closing argument, that the appellant "doesn't have a defense under the law." The following transpired during the prosecutor's closing argument:
"The judge has got a duty to charge y'all on intoxication. Even though, there is really not any evidence that anyone was intoxicated. But, intoxication under the law of Alabama, and I submit to you, that it is not in this case. Intoxication is not a defense to a criminal charge, except as provided in Subsection C of the intoxication statute of the Alabama Code.... [T]he law in Alabama is that intoxication, whether voluntary or involuntary is not a defense to a criminal charge. In fact, he doesn't have a criminalhe doesn't have a defense under the law. *855 It's not a self-defense type thing. It's not
"[DEFENSE COUNSEL]: Your Honor, I object. That's improper argument for him to state or conclude that he does not have a defense under the law.
"[PROSECUTOR]: I submit
"[DEFENSE COUNSEL]: Appropriate instructions to the jury
"THE COURT: Overruled. Go ahead.
"[PROSECUTOR]: I submit to you that the evidence in this case has not proved that any self-defense or legal provocation was exonerated from him for the crime [sic], and I submit to you that from the evidence in this case, that he wasn't intoxicated, and number one, it wouldn't be a defense to the crime."
The appellant objects to the prosecutor's statement that the appellant had no defense under the law on the grounds that it allegedly constituted a comment on the appellant's failure to testify; constituted a misleading and incorrect statement of law; and constituted a statement of the prosecutor's belief of the appellant's guilt.
Although the appellant argues that the prosecutor's comment was a direct reference to the appellant's failure to testify, it is clear from the record that the prosecutor was arguing that there was insufficient evidence to support an intoxication defense. The appellant's taped statement indicated that, prior to the offense, he had been driving around and drinking beer, but the prosecutor was arguing that such evidence did not sufficiently prove intoxication. He was further arguing that, from the appellant's statement, there was no indication of self-defense or any other viable defense.
"The comment at issue here `tends to focus on what the defendant did say rather than what he did not say.' Brinks v. State, 500 So.2d 1311, 1315 (Ala.Cr.App.1986)." Kimble v. State, 545 So.2d 228 (Ala.Cr.App.1989). The prosecutor's comment was calling the jury's attention to the improbability of the appellant's innocence in light of his statement made to the authorities. The jury could not reasonably have construed the prosecutor's comment to be a reference to the appellant's failure to testify.
Neither could the jury have construed the prosecutor's comment to be a reference to the appellant's burden of proof. The appellant argues that the comment was an improper and misleading statement of law which placed a burden on the appellant to come forward with an affirmative showing of innocence. However, as previously stated, the jury was clearly instructed that the trial court would instruct them as to the law. The prosecutor was merely arguing his conclusions from the evidence to the jury. Hutchinson v. State, 516 So.2d 889 (Ala.Cr.App.1987); Ward v. State, 440 So.2d 1227 (Ala.Cr.App.1983); Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982).
The appellant also argues that the prosecutor's comment was an expression of his personal belief as to the appellant's guilt. However, the prosecutor's comment was a statement of opinion concerning his conclusions drawn from the evidence. "While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986). The trial court did not err in overruling defense counsel's objection to the prosecutor's comment.

IX
The appellant argues that the prosecutor impermissibly expressed his personal opinion concerning the merits of the case during his opening and closing arguments. Specifically, he cites the following instances as being improper remarks to the jury:
"He's [the appellant's] up here trying to pull the wool over your eyes."
"And that's what this part of the trial is about, is did that man do it? And, I think you know from everything that has come to you from this place right here. That everything that the Judge has allowed *856 into evidence is beyond a reasonable doubt and to a moral certainty that that man sitting right over there has sunk to the lowest depth of human existence, that he could take another man's life"
"If there's one person in this Courtroom who believes in capital punishment, I can show you who he is. It's that man seated right over there, because he was the judge, jury, and executioner."[7]
"If you want this society to keep on going where you've got burglary alarms, having to fingerprint children"
"I'll submit this to you. That man seated right over there ought to get what they talked about I don't know how many hundred years ago in Aristotle. He ought to get his dues, and I ask you ladies and gentlemen to go out there and convict this man of capital murder as charged in this indictment in the interest of justice and on behalf of the people of the State of Alabama. Thank you very much."
"I'll tell you something ladies and gentlemen, I've worked with Jerry Studdard, Frank Strickland, Mike Martin, Ann Wallace, Clarence Haynes and C.J. Hallmark for a number of years and I hope to have the pleasure to work with them another 20 years."
The appellant argues that the last comment by the prosecutor was improper because, he says, by that statement the prosecutor was vouching for the credibility of the State's witnesses.
While it is true that "[a]ttorneys should be careful in their arguments to the jury to refrain from an injection of their own experience of knowledge in support of their argument," this is to be "distinguished from what they deemed to be reasonable inferences to be drawn from the evidence." Brown v. State, 393 So.2d 513, 516 (Ala.Cr. App.1981). "It is well established that no legal standard exists to judge the prejudicial qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case." Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981), and cases cited therein. "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses `[o]ur task is to consider their impact in the context of this particular trial', and `not view the group of allegedly improper questions and comments in the abstract.' United States v. Davis, 546 F.2d 583, 593 (5th Cir.1977)." Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983).
"The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982). `Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict.' Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984)."
Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App.1986). Furthermore, "[t]he trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958); Hurst v. State, 397 So.2d 203 (Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala.1981)." Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App.1984).
As to the prosecutor's comment concerning the appellant's attempting to "pull the wool over your eyes," we note that "[a] prosecutor as well as defense counsel has a right to present his impressions from the evidence," and "[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way." Watson v. State, 398 So.2d 320, 328 (Ala. *857 Cr.App.1980), writ. denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). Although the appellant's argument presented in his opening and closing remarks to the jury indicated that he did not commit the murder for money, this comment by the prosecutor promoted the State's argument that this defense ran contrary to the appellant's statement admitting that he agreed to commit the murder for $2000. The defense further ran afoul of the State's evidence that the appellant was apprehended with $900 tucked inside his blue jeans.
As to the prosecutor's second noted comment, which states that the evidence proved beyond a reasonable doubt that the appellant committed the offense and further states that the appellant "sunk to the lowest depth of human existence," such a comment does not require reversal. "`[I]t is not improper for [the prosecuting attorney] to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.' 23A C.J.S. Criminal Law § 1104, p. 194-95 (1961)." Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App. 1986). In Galloway, a number of cases are cited in which the prosecuting attorney made comments stating his opinion that the appellant was guilty. Furthermore, because of the evidence presented in this case, it was not error for the prosecutor to refer to the appellant as having "sunk to the lowest depth of human existence."
"In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case. Waldrop v. State, [459 So.2d 953 (Ala.Cr.App.1983), affirmed, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030 [105 S.Ct. 2050, 85 L.Ed.2d 323] (1985) ]; Barbee v. State, [395 So.2d 1128 (Ala.Cr. App.1981)]. We are not dealing here with a case where the evidence is slight; in fact, the evidence of guilt is strong and convincing."
Nicks v. State, 521 So.2d 1018, 1023 (Ala. Cr.App.1987). See also Ringer v. State, 501 So.2d 493, 495 (Ala.Cr.App.1986) (wherein the prosecutor referred to the appellant as a "snake"); Saranthus v. State, 501 So.2d 1247, 1253 (Ala.Cr.App.1985), reversed on other grounds, 501 So.2d 1256 (1986) (in which the prosecutor referred to the appellant as "a bum").
Moreover, the prosecutor's comment that the appellant apparently believed in capital punishment, because he served as judge, jury, and executioner for the victim, was not error. The prosecutor has the right to argue his opinion from the record. See Galloway v. State, supra. See also Wright v. State, 421 So.2d 1324, 1334 (Ala. Cr.App.1982) (wherein it was found not to be error for the prosecutor to refer to the appellant as a "bookie" or "bookmaker" in a prosecution for receiving embezzled property because the prosecutor had a right to present his impression from the evidence). See also Long v. State, 446 So.2d 658, 661-62 (Ala.Cr.App.1983) (wherein the prosecutor referred in closing argument to the appellant as a "pro," because it was a proper inference or conclusion from the evidence). "[T]he use of argumentative language in addressing a jury is the right and duty of an attorney." Trent v. State, 380 So.2d 960, 965 (Ala.Cr.App.1979), writ denied, 380 So.2d 966 (Ala.1980). See also Watson v. State, 398 So.2d 320, 328 (Ala. Cr.App.1980) (wherein this court held that the prosecutor's reference to the appellant as a "bald faced liar" "merely used the vernacular to describe the offense" of perjury).
The prosecutor's comment concerning society's use of burglar alarms and fingerprinting children was simply a "general appeal for law enforcement," which is proper in closing argument. Ex parte Waldrop, 459 So.2d 959, 962 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). A prosecutor "may properly denounce crime in strong terms and point out the gravity, heinousness, and consequences of the crime charged." Wyatt v. State, 419 So.2d 277, 282 (Ala.Cr. App.1982).
"`In Alabama, the rule is that a district attorney in closing argument may *858 make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).' Ex parte Waldrop, 459 So.2d 959, 962 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Allen v. State, 462 So.2d 1031, 1035 (Ala. Cr.App.1984); Patton v. State, 384 So.2d 19, 23 (Ala.Cr.App.), writ denied, 384 So.2d 23 (Ala.1980); Miller v. State, 380 So.2d 1011, 1012 (Ala.Cr.App.1980).
"`This line of argument is "within the latitute allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offenses and as an example to deter others from committing like offenses." Varner v. State, 418 So.2d 961 (Ala.Crim. App.1982); Cook v. State, 369 So.2d 1243 (Ala.Crim.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978).'

"Ex parte Waldrop, supra, at 962. See also Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984)."
Kinder v. State, 515 So.2d 55, 68 (Ala.Cr. App.1986).
The prosecutor's comment referring to the fact that the appellant ought to "get his dues" as in the time of Aristotle, was also not error. In Galloway v. State, supra, the prosecutor, during closing argument, stated that the appellant did "a wrong thing" and "ought to be put in jail for it." This court held that that comment was not an improper statement of guilt based upon the prosecutor's knowledge.
The prosecutor's comment that he had worked with a number of the State's witnesses and hoped to work with them again, was also not an improper comment. The appellant was not bolstering his witnesses' testimony by vouching for their credibility, but rather a reasonable deduction from the evidence. Jones v. State, 497 So.2d 215, 225 (Ala.Cr.App.1986). See also Ex parte Waldrop, supra, at 961 (wherein the prosecutor's comment that the police officers did a good job in their investigation was held to be a reasonable inference properly drawn from the evidence presented at trial).

X
The appellant argues that proof of murder for hire, pursuant to to § 13A-5-40(a)(7) does not suffice to automatically establish the aggravating circumstance that the capital offense was committed for pecuniary gain, pursuant to § 13A-5-49(6). The appellant bases his argument on the fact that he was indicted under the "for hire" portion of the subsection rather than the "for pecuniary or other valuable consideration" portion of § 13A-5-40(a)(7).
While it is clear that the aggravating circumstance, that the offense was committed "for pecuniary gain," can be applied to a capital offense under § 13A-5-40(a)(7),[8]Cook v. State, 369 So.2d 1251, 1256 (Ala. 1978); Ashlock v. State, 367 So.2d 560, 561 (Ala.Cr.App.1978), writ denied, 367 So.2d 562 (Ala.1979); Johnson v. State, 399 So.2d 859, 867 (Ala.Cr.App.1979), we can find no authority for the proposition that this aggravating circumstance is automatically to be applied to the capital offense of murder for hire. Therefore, we must look to the definition and application of "hire," as encompassed in "murder for hire," and "pecuniary gain," as encompassed in the aggravating circumstance.
In order to apply the aggravating circumstance of "for pecuniary gain," it is clear "that the receipt of something of pecuniary value must be the impetus for the murder." State v. Nash, 143 Ariz. 392, 694 P.2d 222, 231 (1985), cert. denied, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). See also Cook v. State, supra. Other states have found automobiles to constitute "something of pecuniary value," State v. *859 Libberton, 141 Ariz. 132, 685 P.2d 1284, 1291 (1984), as well as the desire to establish "a remunerative drug-dealing network and [the] need to establish a reputation as a collector of debts." Parker v. State, 458 So.2d 750, 754 (Fla.1984), cert. denied, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). See also McNamara v. State, 203 Ind. 596, 181 N.E. 512, 514 (1932) (a blackmail case wherein the court construed, "or any pecuniary advantage whatsoever" to "refer to and include many things of a pecuniary nature which could not be designated as `money' or a `valuable security'"). "Pecuniary gain" does not refer to the fruits of the offense, but to the situation where one is hired or paid to commit the offense. State v. Nash, supra. See also 31A Words and Phrases (1957) at 335 (cum. supp. 1988). In State v. Abdullah, 309 N.C. 63, 306 S.E.2d 100, 108 (1983) the court held that the aggravating factor regarding pecuniary gain could be applied only where there is "evidence that defendant was hired or paid to commit the crime." See also Johnson v. State, 665 P.2d 815, 824 (Okl.Cr.App.1982), wherein the court addressed the application of the aggravating circumstance of "murder for remuneration or the promise of remuneration," stating:
"We find that the traditional application for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder. See McManus v. State, 591 S.W.2d 505 (Tex.Cr.1979); Doty v. State, 585 S.W.2d 726 (Tex.Cr. 1979). Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy, murder of a testator in order to secure a devise or legacy, and killings which occur in a kidnapping-extortion situation."
In Alabama, while "pecuniary gain" is not defined by the Code, the similar term "pecuniary benefit" is defined under the article dealing with bribery and corrupt influence, in § 13A-10-60(b)(2), as follows:
"Benefit in the form of money, property, commercial interests or anything else the primary significance of which is economic gain...."
Thus, we conclude that "pecuniary gain," as used in the language stating the aggravating circumstance, encompasses more than just money and can include anything that results in an economic gain.
In construing the term "hire," as encompassed in "murder for hire," we will first look to the term's ordinary meaning. "`Webster defines the noun hire as "the price, reward, or compensation paid, or contracted to be paid for * * * personal service, or for labor." It is also defined as "the price or compensation for labor and services." 29 C.J. 756.'" State v. Kenyon, Inc., 153 S.W.2d 195 (Tex.Cir.App.1941). See also State v. Welch & Brown, 187 Okl. 470, 471, 103 P.2d 533, 534 (1940).
"`The element of price or reward is inherent in the word "hire." A contract of hire, therefore, would be a most unusual undertaking if it did not involve something by way of recompense; and we think that no such unusual use of words was intended by the legislature in this instance.'"
Evans v. Phoenix Insurance Co., 175 So.2d 425, 430 (La.Ct.App.1965).[9]
Because we feel that "pecuniary gain" in the context of an aggravating circumstance of capital murder includes more than strictly money, and can encompass other valuable consideration or economic gain, and because "murder for hire" was intended by the legislature to include some sort of consideration, we hold that the aggravating circumstance of "pecuniary gain" automatically applies to a "murder for hire" situation wherein the "hiree" is charged with the offense.

XI
The appellant argues that the trial court's charge to the jury during the sentencing phase of the trial was insufficient *860 because, he argues, it provided no guidelines for weighing the aggravating and mitigating circumstances. However, the record indicates that the trial court clearly defined aggravating and mitigating circumstances, as follows:
"An aggravating circumstance is a circumstance specified by law which indicates, or tends to indicate, that the defendant should be sentenced to death. A mitigating circumstance is a circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without the benefit of parole instead of death."
The trial court further instructed the jury concerning the weighing process and what could be considered for purposes of arriving at their recommendation. The trial court then instructed the jury as to the one aggravating circumstance, that the capital offense was commited for pecuniary gain, and as to all of the statutory mitigating circumstances, as well as any non-enumerated mitigating circumstances, including "any aspects of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for his sentence of life imprisonment without parole instead of death." The trial court thereafter instructed the jury concerning the weighing process, as follows:
"[A] a process of weighing aggravating and mitigating circumstances against each other in order to determine proper punishment is not a mechanical process. Your weighing of the circumstances against each other should not consist of merely adding up the number of aggravating circumstances, which is one in this case, and comparing that number with the total number of mitigating circumstances in this particular case.
"Whatever your recommendation to the court is, it should not be based on passion, prejudice, or any other arbitrary factors.
"....
"If after a fair and full consideration of all the evidence in the case, you are convinced beyond a reasonable doubt and to a moral certainty that at least one of the aggravating circumstances does exist, and you are convinced that the aggravating circumstances outweighs the mitigating circumstances, your verdict would be:
"`WE, THE JURY, RECOMMEND THAT THE DEFENDANT, CURTIS LEE HENDERSON, BE PUNISHED BY DEATH.'
"... On the other hand, after considering all the evidence if it is your recommendation that the defendant should be punished by life imprisonment without parole, the form of your verdict would be:
"`WE, THE JURY, RECOMMEND THAT THE DEFENDANT, CURTIS LEE HENDERSON, BE PUNISHED BY LIFE IMPRISONMENT WITHOUT PAROLE.'"
These instructions were sufficient to inform the jury about the weighing process. See Ex parte Cochran, 500 So.2d 1179 (Ala.1985).

XII
The appellant argues that the trial court erred in allowing the entire contents of the appellant's presentence investigative report into evidence. The record indicates that the appellant objected to certain portions of the report, specifically: that he was to have obtained a sawed-off shotgun to use against the victim, but was unable to do so and, therefore, purchased a pistol from his father, which he used to commit the offense; that the appellant told Cleveland Turner, Jr., "That problem you got, you ain't got to worry about it, I done took care of it"; that the victim's wife, who had been involved with Cleveland Turner, Jr., had moved in with Turner's brother; and a statement that the appellant's age was 23, though it was actually 22 and he was only 21 at the time of the offense. When defense counsel requested the trial court to rule on the motion made concerning these statements, the court replied:
"Without specifically ruling on the motions, I just want to tell the parties that the court is going to use this report, the contents of it only as allowed by law. A *861 formal ruling will come forth. I wanted to emphasize that to you at this point in time."
The trial court never entered a formal ruling on the appellant's motion.
Where matters are included in a pre-sentence report which are not proper for determining sentence, but the trial court does not consider the improper matters in determining the sentence, there is no error. See Thompson v. State, 503 So.2d 871, 880-81 (Ala.Cr.App.1986), affirmed, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). In the present case, the trial court's "Consideration, Findings and Determination of Sentence as Required by Section 13A-5-47(b)," clearly indicates that the matters objected to were not considered. In this order, the trial court notes that the age of the defendant at the time of the crime was 21 years. Furthermore, the only mention of consideration of the pre sentence report is found in this statement of the trial court:
"The Court has made a diligent search under the provisions of Section 13A-5-52, the evidence offered by the defendant, and aspects of pre-sentence report favorable to the defendant on mitigating to determine if there is any aspect of the defendant's character or record or any circumstance of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that the only mitigating circumstance, statutory or non-statutory, is the absence of a prior criminal record." (Emphasis added.)
The only aggravating circumstance found by the trial court was that the capital offense was committed for pecuniary gain. None of the statements objected to was relevant to this aggravating circumstance. Therefore, in light of Thompson v. State, supra, we find no error b the trial court.

XIII
The appellant argues that the trial court erred in failing to allow his defense counsel to withdraw so that at the hearing on the motion for new trial he could testify concerning the appellant's I.Q. score of 68. He further argues that the trial court abused its discretion in not finding this I.Q. score as a non-statutory mitigating circumstance. However, any error in not allowing defense counsel to withdraw was harmless, because the appellant's motion for new trial was properly overruled. Following the appellant's trial, he was given an I.Q. test in order to determine whether he could have knowingly and intelligently waived his Miranda rights in order to give his confession. His lawyers testified that this was new evidence which they could not have ascertained prior to trial; they say they had no reason from their discussions with the appellant to suspect that his I.Q. would be so low. The hearing on the appellant's motion for new trial revealed that his overall score was 68; this included a combined score of 73 on his verbal I.Q. and 63 on his performance I.Q. The administrator of the test admitted that a verbal I.Q. score of 73 was in the normal range, verbal I.Q. meaning "knowledge that you can think or read and understand." As to the appellant's performance I.Q. scores, meaning "working skills, working with your hands," it was revealed that the appellant took the test while handcuffed and without his glasses. We find no abuse of discretion by the trial court in denying the appellant's motion for new trial and, therefore, we hold that the appellant's substantial rights were not prejudiced by the trial court's refusal to allow defense counsel to withdraw in order to testify. Rule 45, Alabama Rules of Appellate Procedure.
The appellant further argues that the trial court erred in failing to find that his I.Q. score of 68 was a non-statutory mitigating circumstance. The record indicates that, on the date of the trial court's denial of the appellant's motion for new trial, a second order on determination of sentence was issued. Although this second sentence order did not refer to the appellant's I.Q. score as a non-statutory mitigating circumstance, it is clear that it was issued after the trial court had been given the opportunity to consider the score, and had determined that it did not constitute a non-statutory mitigating circumstance. However, the order does not specifically state that the trial court considered the *862 appellant's I.Q. score and made that determination. Therefore, pursuant to Ex parte Cochran, 500 So.2d 1179, 1187 (Ala.1985), this cause must be remanded for the trial court to enter specific findings as to whether the appellant's I.Q. score constituted a non-statutory mitigating circumstance in this case. In Ex parte Cochran, supra, the Alabama Supreme Court stated that "the trial judge should enter specific written findings on the existence or non-existence of each of the statutory mitigating circumstances, see Code 1975, § 13A-5-33(2) (Repealed), and of any additional mitigating circumstances of which evidence is offered." "Id. at 1187. (Emphasis added.) Therefore, despite the clear indication that the trial court considered the appellant's evidence presented in his motion for new trial, specific written findings must be issued.
OPINION EXTENDED; AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
All Judges concur except BOWEN, J., concurring in result only.

ON RETURN TO REMAND
McMILLAN, Judge.
The trial court has filed a second, amended consideration, findings, and determination of sentence, as required by § 13A-5-47(b), Code of Alabama (1975). Therein, the trial court made specific written findings concerning his consideration of the appellant's evidence presented to establish the non-statutory mitigating circumstance of his low performance on a test to determine his intelligence quotient. The trial court specifically found that the appellant's low intelligence quotient score did not constitute a non-statutory mitigating circumstance in this case. In light of the evidence presented, the trial court properly found that the appellant's intelligence quotient score of 68 was not a non-statutory mitigating circumstance.
OPINION EXTENDED; AFFIRMED.
All Judges concur.
NOTES
[1] Although there is no evidence in the record that this potential juror's mother was charged with murder, the prosecutor used his eleventh strike against a white potential juror, Kathy Jenkins, who stated that her father was prosecuted for murder.
[2] The record indicates that a potential juror, Donald Dean, responded that he had been a character witness in a murder case in Calhoun County. He was struck by defense counsel.
[3] A white potential juror, Joann Johnson, was also struck by the State. She had responded that her husband had worked with Cleveland Turner, Jr.
[4] This case arose under California's 1978 death penalty initiative, codified as Penal Code §§ 190-190.5. There was a guilt and a separate penalty phase conducted at trial.
[5] There were three panels of potential jurors examined. Defense counsel attempted to raise the referenced point during each questioning of the separate panels. The quoted portion of the transcript derives from defense counsel's questioning of the first jury panel.
[6] In his arguments to the jury, defense counsel maintained that the State would be unable to prove the "for hire" element of the offense.
[7] Defense counsel objected to this statement by the prosecutor, and the trial court overruled the objection, stating, "I'm going to instruct y'all about this."
[8] In Cook v. State, 369 So.2d 1251, 1256 (Ala. 1978), and its progeny, it was held that the aggravating circumstance that a capital felony was committed for pecuniary gain would "cover a variety of crimes committed with the hope of financial benefit, ranging from `murder-for-hire' to an heir killing his benefactor to gain his inheritance." This aggravating circumstance, however, should not be applied to a robbery.
[9] Although this language addresses "contracts of hire" in the civil context, we find the language to be applicable to the "for hire" aspect of "murder for hire" in a criminal context.