666 So.2d 835 (1993)
Robert Paul GOSPODARECK
v.
STATE.
CR-91-612.
Court of Criminal Appeals of Alabama.
April 16, 1993.
As Corrected on Denial of Rehearing May 28, 1993.
*836 William Dawson and Gayle H. Gear, Birmingham, for appellant.
James H. Evans, Atty. Gen., and Randall McNeill, Asst. Atty. Gen., for appellee.
MONTIEL, Judge.
The appellant, Robert Paul Gospodareck, was indicted for the offense of murder, made capital because it was accomplished pursuant to a contract. See § 13A-5-40(a)(7). The jury found the appellant guilty "as charged in the indictment." The trial court sentenced the appellant to life imprisonment without the possibility of parole pursuant to the jury's recommendation.
The evidence presented by the state tends to establish the following facts. Jerry Wayne Callahan, the victim, was the proprietor of two businesses: J.C.'s, a wholesale diamond business, and Riverchase Jewelers, in which he owned a 90% interest. Pat Costello owned the other 10% interest in Riverchase Jewelers. Colleen Norton testified that she had loaned Callahan money over several years to finance his businesses. Norton testified that she decided to "call" the notes evidencing the loans to Callahan and that she relayed this information to Callahan in late November 1990. This information upset Callahan and he indicated to Norton around December 13, 1990, that he "would just have to have himself killed" (R-1003) so that the insurance would pay his debts. Norton said that on another occasion, Callahan told her that he would not "be around" for the Super Bowl in January. Callahan died on February 7, 1991.
Pat Costello testified that Callahan was upset over his financial situation and that he once commented that he would be better off dead. He indicated that Callahan liked to gamble. Costello testified that Greg Brown, a bookie, frequented their jewelry store on average twice a month to accommodate Callahan's gambling activities. The frequency of Brown's visits increased in January 1991. Costello testified that approximately 7 to 10 days before Callahan's death, Brown entered the store with the appellant. Brown went to the rear of the store to talk to an employee and the appellant stayed at the counter in the front of the store. Costello stated that the appellant expressed an interest in looking at watches while he waited on Brown. Diana Treat, an employee, testified that she overheard the appellant say to Costello that "he was going to be coming into some money *837 soon and he wanted to buy a fine watch." (R-1025.)
Jerry Noto, the owner of the Pic-a-Pac convenience store; Frank Garner, a friend of Noto's; and Jeff King and Mike Koutroulakis, City of Hoover police officers, testified that on Tuesday, February 5, 1991, at around 5:30 p.m., Brown was in the store and was displaying two guns. These guns were later determined to have been owned by Callahan.
On Wednesday, February 6, Callahan, Noto, and Garner attended a card game. Noto testified that Brown was the dealer. Garner testified that Callahan had winnings from the game that fluctuated during the course of the game between $1,000 and $6,000.
Roddy Gorman testified that he and Brown were engaged in an enterprise where they acted as the "house" in card games. He explained that this meant that he paid off the house's losses. Gorman testified that he was responsible for covering 80% of the losses and that Brown was responsible for covering 20% of the losses. He testified that on Thursday, February 7, Brown telephoned him to obtain money to pay off losses from the card game held the previous evening. Gorman testified that he met with Brown shortly after 5:00 p.m. on February 7 and that he gave him $9,000 in cash to give to Callahan.
Costello testified that Callahan did not come to the jewelry store on Thursday, February 7. Costello testified that Brown came into the store twice that day. Brown first came into the store between 10:00 and 10:30 a.m. to pick up a ladies diamond solitaire ring, with an appraised value of $15,600, that Callahan had instructed be given to Brown. Brown came to the store a second time between 1:00 and 1:30 p.m. to pick up some paperwork on the ring. Costello testified that during the interim he talked with the victim by telephone. Costello testified that Brown never paid for the ring.
Noto testified that Brown came to his store twice on Thursday, February 7. On the first occasion, Brown showed him a ladies diamond ring. Frank Garner also testified that he saw Brown at the store on this date displaying the ring. Noto testified that he left the store and returned around 4:30 or 5:00. Several police officers indicated that they had seen Brown at the store between 4:30 and 5:00 and that he was alone. Noto testified that when he returned to the store, Brown was not there but he said that Brown arrived shortly thereafter with the appellant. Noto testified that Brown and the appellant talked and that the appellant then got into his truck and drove away. Testimony established that Callahan's apartment was near Noto's store.
George DeGraw, a neighbor who lived in the apartment directly above Callahan's, testified that between 3:30 and 4:00 p.m. on the day of the incident he heard a knock on his door. When he answered the door, he saw a man going down the stairs. He called to the man but the man did not respond. DeGraw described the man as "husky" (R-1043) and stated that his build resembled the appellant's.
Jayne Boyd, a neighbor of Callahan's, testified that she heard a loud bang sometime between 3:30 and 5:00 p.m. on Thursday, February 7.
Amy Hill, who had been dating Callahan, testified that on February 7, she spoke with Callahan by telephone. He instructed her to come to his apartment at 5:00 p.m. She testified that he told her that if he did not come to the door she was to let herself in. She stated that she thought that this was unusual. She arrived at the apartment at the appointed time. When she entered the apartment, she saw Callahan lying on the floor. She said that the door to Callahan's office, which he normally kept locked, was open.
Emergency and law enforcement personnel were then called to the scene. There was no evidence of a struggle and neither Brown's fingerprints nor the appellant's were found at the scene.
The investigation led the police to focus on Brown as a suspect. Detective Eddie Braden of the Hoover Police Department testified that he arranged to meet with Brown and that the police stopped Brown in his automobile when it appeared that he was *838 attempting to flee. Brown showed the law enforcement officers a note he had in his vehicle. After obtaining permission, the officers searched the automobile.
The note was allegedly written by Callahan. It stated that if certain parties were arrested for his death, he did not want them to be prosecuted. The note indicated that Callahan had a fatal illness, which fact could be attested to by Dr. Clark and Dr. Zeiger. It stated that because of this illness, Callahan had called upon a friend to perform the ultimate act of friendship. Linda Callahan, Callahan's ex-wife, testified at trial that the note appeared to have been written by Callahan. Lamar Miller, a documents examiner with the department of forensic sciences, testified that, in his opinion, the note had been written by Callahan.
The two pistols Brown had been displaying earlier, which had belonged to the victim, were also found in the automobile. Brown was placed under arrest. A statement given by Brown led the police to the appellant.
The appellant, a police officer, was arrested on February 9, 1991, and was taken to the Hoover city jail. Eventually, the appellant gave a statement. He indicated that he and Brown were friends. He stated that approximately three weeks before Callahan's death, Brown had approached him regarding a problem. Brown told him that he had a friend who was suffering from a fatal illness and that this friend wanted to die before he died from the illness. Brown told the appellant that Callahan wanted Brown to kill him or to have him killed and that he did not want the killing to look like a suicide. He stated that approximately one week before Callahan's death, Brown again approached the appellant and stated that Callahan had told him that he "had to leave this world prior to the 8th of February." (R-1466.) The appellant indicated that Brown told him that Callahan's condition was worsening. The appellant stated that Brown told him that he was getting a good deal on a ring appraised at $15,800.
The appellant stated that Brown met with him one day and told him that he had some 9-mm. ammunition. He also told the appellant that Callahan had given him some guns. He asked the appellant to run a check on the serial numbers on the guns. The appellant ran the check. The appellant stated that on this occasion Brown again told him that Callahan was expecting Brown to kill him. Brown asked the appellant for advice. The appellant recommended that Brown have Callahan write a note stating that he was dying and that he did not want to commit suicide.
The appellant said that Brown telephoned him on Thursday, February 7. Brown told the appellant that Callahan had won $15,000 in a card game the previous night and that he was demanding to be paid. Brown asked the appellant to meet him at the Pic-a-Pac later that day. The appellant met Brown around 3:30 p.m. Brown told the appellant that Callahan was going into the hospital the next morning and that he wanted something done right away. Brown told the appellant that Callahan had written the note and the appellant stated that he had seen the note. Brown told the appellant that he could not kill Callahan. The appellant stated that in addition to the note written by Callahan, he also saw the ring and a promissory note evidencing a $12,000 debt. The appellant told Brown that he had to either tell Callahan he was not going to kill him or he had to do it. The appellant told Brown that he would talk to Callahan for him.
Brown then drove the appellant to Callahan's apartment complex. Brown told the appellant how to find Callahan's apartment. The appellant testified that he initially went to the wrong apartment and that an older man came to the door of that apartment. At that time Callahan came out of his apartment and told the appellant that he was Jerry Callahan. Brown had driven away, allegedly to obtain the appraisal on the ring.
The appellant initially told the officers that when he entered the apartment he talked with Callahan. He explained to Callahan that Brown would not be able to perform the task he had asked him to perform. According to the appellant, this angered Callahan. Callahan called Brown and told him to return to pick up the appellant. The appellant at first stated that when he left the apartment, *839 Callahan was alive. He indicated that Callahan gave him a gun to give to Brown.
Upon further questioning, the appellant confessed to killing Callahan. He stated that when he went to the apartment to talk with Callahan, Callahan started talking about his illness. The appellant said that Callahan picked up a gun and begged him to "put him out of his misery." (R-1583.) The appellant said that Callahan told him where to place the gun. The appellant said that he told Callahan that he could not do it. The appellant stated that Callahan begged him to pull the trigger and that after about two minutes, he complied. The appellant then picked up the spent rounds of ammunition. The appellant stated that he disposed of the slide and the barrel of the gun. He placed the remainder of the gun in a warehouse he rented. Although the appellant admitted shooting Callahan, he contended that he did not do it for pecuniary gain. He stated that he did not receive any payment for killing the victim.
A search of the appellant's apartment revealed a notepad with several numbers written on it. Testimony at trial indicated that the numbers on this pad matched the serial numbers on the weapons found in Brown's automobile during the search. Additionally, one of the serial numbers matched a firearms record taken from the victim's apartment.
A search of the warehouse that had been rented by the appellant turned up a pistol frame (without a barrel or a slide), a black leather holster, and a .380 caliber magazine.
Dr. Robert Brissie testified that the victim died as a result of a gunshot wound.

I.
The appellant contends that the trial court erred in denying his pre-trial motion to suppress his statement because, he argues, the events surrounding his arrest invalidated his waiver of his right to remain silent and his right to counsel. Numerous hearings were held on this motion. The evidence presented at these hearings tends to establish the facts set out below.
The appellant was arrested at his apartment at 7:00 a.m. on Saturday, February 9. The appellant was informed of his rights at the scene. After his arrest, the appellant was taken to the Hoover city jail. He apparently was not processed immediately. The investigating officers left the jail, with the understanding that they would reconvene later that afternoon at the jail.
It is clear from the testimony and from the transcripts of the telephone records of the jail, that jail personnel were under the impression that they were not to disclose that the appellant was being held. The appellant's wife testified in the suppression hearing that she first contacted the jail around 9:00 a.m. She testified that she telephoned the jail several times and left messages but that none of her telephone calls were returned. She testified that during the course of some of these calls, she inquired of the person who answered the telephone about the appellant's whereabouts and specifically asked if he was in the jail. The person that spoke with her told her that he could not provide that information and that she would have to speak with one of the investigating officers. She went to the jail around 1:00 p.m., but she was not allowed to see the appellant. She said that at that time the police finally acknowledged that the appellant was being held but that they would not allow her to see him. At one point, she was informed that the appellant was not allowed any phone calls or visitors. She then contacted Gayle Gear, an attorney.
Gear testified that she telephoned the Hoover jail and asked if the appellant was being held there. The person she spoke with told her that he did not have the authority to disclose that because he said he had to determine if he could tell her whether the appellant was being held there. When she telephoned again, this person explained that he had not been able to determine whether he could release that information. Gear informed Richard Storm, an attorney in her office, of the situation.
Storm then telephoned the Hoover jail. Whoever he spoke with would not reveal whether the appellant was being held there. Storm went to the jail around 5:00 p.m. He inquired whether the appellant was being held. Initially he was told by jail personnel *840 that they did not know if the appellant was in custody. Upon further inquiry, he was told that he would have to speak with Detective Braden. Storm testified that over the course of 4 hours he asked to speak with the appellant approximately 20 times. Eventually, he spoke with Detective Braden. Storm testified that he asked Braden to inform the appellant that he was there and to tell him not to make a statement without Storm's being present. Braden informed Storm that because the appellant had not requested an attorney Storm could not see him. Storm then asked Braden to tell the appellant that he was there; Braden indicated that he would. The appellant was eventually informed that an attorney was at the jail to see him. He was informed of this after he had given his oral confession and before his written statement had been obtained.
In Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the United States Supreme court addressed the issue of whether the deliberate deception of an attorney by the police, which was unknown by the defendant, affected the defendant's ability to knowingly waive his Miranda rights. The Court concluded:
"[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his Miranda rights unless he were aware of the incident.... Granting the `deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information Miranda requires the police to convey, the waivers were valid."
475 U.S. at 423-24, 106 S.Ct. at 1142 (emphasis added).
This court, relying on Moran, has held: "An adult need not be informed of his lawyer's presence at the place where the adult is being interrogated when the adult does not ask to see his lawyer." Aultman v. State, 621 So.2d 353 (Ala.Crim.App.1992).
From our examination of the record, it appears that the appellant was not aware of the actions of the police in not allowing his attorney to contact him for several hours. The appellant was read his rights at the scene of his arrest. He was also read his rights prior to, and during the course of, the interrogation. The record contains a signed waiver of rights form. There is no indication that the appellant ever asserted his right to remain silent or that he ever requested an attorney. It does not appear that Gail Gospodareck was acting upon a request from the appellant when she contacted the attorney. The appellant never requested to use the telephone. Although not dispositive of the issue, we note that the appellant was an experienced law enforcement official who surely was aware of an individual's rights when he is taken into custody.
Thus, we conclude that the events that occurred without the appellant's knowledge did not render invalid his waiver of his right to remain silent or of his right to counsel.

II.
The appellant further asserts that the trial court erred in denying his pre-trial motion to suppress his statement because, he says, the statement was obtained by coercion and inducements. During the interrogation, the appellant admitted going to the victim's apartment on the day of the incident, but he stated that the victim was alive when he left. The interrogating officers then confronted him with evidence in their possession and told him that they thought he had committed the murder. The officers told the appellant that he needed to tell them whether he had performed a mercy killing or whether he had killed the victim for pecuniary gain. The appellant continued to maintain his innocence. An officer then began to explain the ramifications of a conviction of capital murder to the appellant. An investigating officer told the appellant:

*841 "If you did this as a friend of Greg, you need to tell us that because right now you're looking at capital murder, and capital murder, you know, you're a police officer, and you know what that means. You know what that means. The death penalty. And only you canonly you can try to tell us something that makes our mind change." (R-1558.)
The officers continued to confront the appellant with the evidence against him. Then an officer stated:
"If you did it and it wasn't capital murder, then let's prove it wasn't. Okay? Let's prove it wasn't. Let's do it and let's prove it wasn't because I don't want to see you sitting there in that ... penitentiary for the rest of your life.... In the gas chamber." (R-1560-61.)
The interrogation continued and the appellant eventually confessed to killing the victim. The appellant adamantly denied that he committed the murder for pecuniary gain.
"The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or manifestly wrong. The trial judge, in determining the voluntariness of a confession, must consider all the attendant circumstances, with the ultimate inquiry being `whether the defendants' rational intellect and free will were overcome at the time of his confession."
McCammon v. State, 499 So.2d 811, 815 (Ala. Crim.App.1986) (citations omitted).
"The finding of the trial court [as to voluntariness] will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made."
Jackson v. State, 562 So.2d 1373, 1381 (Ala. Crim.App.1990) (citations omitted).
At the conclusion of the hearings on the motion to suppress, the trial court determined that the statement was voluntary. Testimony elicited during the hearings indicated that the appellant was read his rights when he was arrested. No questions were directed to appellant between the time he was taken into custody and later that evening when he was interrogated. Detective Braden testified that neither he nor anyone in his presence made any promises or offered the appellant any hopes of reward, money, or other inducement in order to obtain his statement. He also testified that no one told the appellant that it would be better or worse for him if he made a statement. He further indicated that no one had threatened the appellant to induce him to make a statement. According to Detective Braden, the appellant was appraised of his rights before his interrogation. Braden said that the appellant indicated that he understood his rights and that he signed a waiver of rights form. When a break occurred in the interrogation, the appellant was again informed of his rights before the questioning was continued.
In Thomas v. State, 531 So.2d 45 (Ala. Crim.App.1988), this court dealt with the issue of whether a motion to suppress a statement of a defendant, who was a former police officer, was properly denied. The fact that the defendant was a former police officer was considered by the court in determining that the defendant's will was not overborne. Likewise, in this case, the fact that the appellant was a seasoned police officer is a factor in determining whether his will was overborne.
After carefully examining the record and considering all the attendant circumstances, we cannot say that the appellant's will was overborne when he confessed to the crime. Accordingly, we must affirm the decision of the trial court denying the appellant's motion to suppress.

III.
The appellant contends in his third issue that the conviction for capital murder *842 constitutes cruel and unusual punishment because, he says, the evidence tended to show that he was assisting the victim in a suicide. He specifically asserts that the jury should not have been charged on capital murder because, he argues, the evidence tended to establish that the victim wanted to be killed, and that at most the appellant was guilty of murder.
This argument is without merit. There is some evidence that the victim wanted to die and that he solicited assistance in accomplishing this; however, as the appellant concedes, consent is not a defense to murder. See Ala.Code, § 13A-2-7. The fact that the victim may have participated in his death or consented to it was appropriately considered by the jury as a mitigating factor in the sentencing phase of the trial. See Ala.Code § 13A-5-51(3). There was sufficient evidence presented that when the appellant killed the victim, he was acting pursuant to a contract that he had entered into Greg Brown, and the killing would therefore be considered a murder for hire as defined in Ala.Code § 13A-5-40(a)(7). Thus, the charge on capital murder was proper.

IV.
The appellant contends that the trial court erred in not denying his motion for a judgment of acquittal. Specifically, he asserts that the State failed to prove that the appellant received any pecuniary gain.
The appellant was indicted in a two-count indictment. The jury found the appellant guilty of count II, which reads, in pertinent part:
"Robert Gospodareck did intentionally cause the death of Jerry Wayne Callahan by shooting him with a pistol, pursuant to a contract, to-wit: the said Robert Paul Gospodareck and the said co-defendant, Gregory Allan Brown, did agree to intentionally cause the death of the said Jerry Wayne Callahan for the consideration or price of Nine Thousand Dollars of lawful currency of the United States or America, a more particular description and denomination of which is to the grand jury otherwise unknown, and/or one ladies diamond solitaire ring of the value of Six Thousand, Five Hundred Dollars and/or three pistols, in violation of Section 13A-5-40(a)(7) of the Alabama Criminal Code." (Emphasis added).
Section 13A-5-40(a)(7) makes capital the offense of "[m]urder done for pecuniary or other valuable consideration or pursuant to a contract or for hire" (emphasis added). We do not adhere to the appellant's position that to prove a prima facie case of the offense charged the state must show that the appellant was in actual possession of the gain for which the appellant allegedly committed the offense. It is enough to show that he acted in anticipation of receiving pecuniary gain. See Henderson v. State 584 So.2d 841, 859 (Ala.Crim.App.1988), where we stated, "`[P]ecuniary gain' does not refer to the fruits of the offense, but to the situation where one is hired or paid to commit the offense."[1]
The evidence of the contract between the appellant and Brown is circumstantial.
"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."
Cumbo v. State, 368 So.2d 871, 874 (Ala. Crim.App.1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala.1979). There was evidence presented that on several occasions before the victim's death the appellant and Brown discussed killing the victim. The appellant instructed Brown to have the victim write a note explaining his death. A witness testified that, approximately one week before the victim's death, when the appellant was looking at watches in the jewelry store, she heard him say that he was going to be coming *843 into some money. Several witnesses had seen Brown displaying the guns that he said he had received from the victim. The appellant was also aware that Brown was in possession of these weapons. The victim allegedly wanted to be killed because of a fatal illness, yet neither of the doctors named in the note found in Brown's car had treated the victim. A note pad found in the appellant's apartment contained the serial numbers of some guns, which matched the serial numbers of the weapons found in Brown's automobile. Parts of a gun that had belonged to the victim were found in a warehouse rented by the appellant. The appellant admitted that he had asked Brown to lend him $1,000 when everything "blew over." There was some evidence that Brown had been given $9,000 to deliver to the victim, yet this money was never located.
Based on the above, we think that there was sufficient evidence from which the jury could find that the appellant murdered the victim pursuant to a contract.

V.
The appellant asserts that the trial court erred in giving a jury charge on the meaning of the term "contract." The record reflects that at the conclusion of the court's charge, a juror requested that the court define the term "contract." After a discussion outside the presence of the jury, the jury was reconvened and the following occurred:
"THE COURT: ... I was asked to define `contract,' in the context of this particular charge, which is in the second count of the indictment. And keep in mind my instruction about all of the elements of this offense as well as the other ones and the burden of proof in this case. And, of course, the State has the burden of proving guilt beyond a reasonable doubt, and they must prove each of the elements of this offense. And the elements are, of coursethere are two components. One that the defendant committed the crime of murder of the intentional killing type; and, two, that it was committed by the defendant for pecuniary or other valuable consideration as charged in count one or pursuant to a contract. Those, of course, are the elements of the offense which the State has the burden of proving beyond a reasonable doubt.
"To answer your question, keep in mind the indictment itself defines this contract, and I'll read that again.
" "The grand Jury of said County further charges that before the finding of this indictment Robert Paul Gospodarek did intentionally cause the death of Jerry Wayne Callahan by shooting him with a pistol pursuant to a contract, to wit.' And it describes the contract. `That the said Robert Paul Gospodarek and the said co-defendant, Gregory Allen Brown, did agree to intentionally cause the death of the said Jerry Wayne Callahan for the consideration or price of $9,000 of lawful currency of the United States of America, a more particular description or denomination which is to the Grand Jury otherwise unknown and/or one ladies diamond solitaire ring of the value of $6,500 and/or three pistols in violation of the Alabama Criminal Code.'
"In defining an agreement or contract in the context of this particular count, the definition is that it's an agreement between two people that one of them will commit an intentional killing in return for something of value or promise of value from the other person." (Emphasis added.)
The appellant objected to the court's charge on the same grounds he now raises on appeal. The appellant contends that the court's definition of "contract" is overly simplistic and that it presupposes the existence of a contract rather than leaving this issue for the jury's determination.
"It has long been the position of this court that the trial court's oral charge to the jury may not be viewed in bits and pieces but rather must be viewed in its entirety."
Adams v. State, 587 So.2d 1265, 1269 (Ala. Crim.App.1991) (citations omitted).
After reviewing the court's charge as a whole, we do not conclude that the court's charge on the definition of "contract" amounted to reversible error.
The judgment of the trial court is affirmed.
AFFIRMED.
*844 All the Judges concur.
TAYLOR, J., concurs specially with opinion.
TAYLOR, Judge, concurring specially.
Under the law as set out in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), and cases relying on it, I am obliged to concur even though I consider it bad law. I write specially to express my view that by denying an accused's family and attorney the opportunity to speak to him and by refusing to tell his family and attorney whether the accused is in custody, law enforcement authorities put themselves in a bad light. These actions create the impression that the authorities are not acting in good faith and contribute to a public perception of "police-state" tactics. The United States Supreme Court should give further consideration to this issue.
NOTES
[1] The court in Henderson was ... addressing the issue of whether the "proof of murder for hire, pursuant to § 13A-5-40(a)(7) automatically establishes the aggravating circumstance that the capital offense was committed for pecuniary gain, pursuant to § 13A-5-49(6)."