666 So.2d 844 (1995)
Ex parte Robert Paul GOSPODARECK.
(Re Robert Paul Gospodareck v. State of Alabama).
1921341.
Supreme Court of Alabama.
June 23, 1995.
Rehearing Denied July 28, 1995.
*845 William M. Dawson and Gayle H. Gear, Birmingham, for Petitioner.
Jeff Sessions, Atty. Gen., and Beth Slate Poe, Asst. Atty. Gen., for Respondent.
PER CURIAM.
We granted Robert Paul Gospodareck's petition for a writ of certiorari to review his contention that the trial court erred in denying his pre-trial motion to suppress his statement. He argues that the events surrounding his arrest invalidated his waiver of his right to remain silent and his right to counsel. See Gospodareck v. State, 666 So.2d 835 (Ala.Crim.App.1993), for a full statement of the facts.
Gospodareck was a former police officer and, at the time of his arrest, was a deputy sheriff. Gospodareck was read his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he stated that he understood those rights. At no time did Gospodareck request to see or talk with a lawyer. At no time did Gospodareck request to make a telephone call. In Miranda, the United States Supreme Court recognized that custodial interrogations, by their very nature, place pressure upon an accused to speak where he might not otherwise do so. Because of this, Miranda requires law enforcement personnel to inform an accused, before questioning, that they intend to use any statement that he makes to obtain a conviction, that he has a right to remain silent, and that he has a right to consult a lawyer, if he so desires. 384 U.S. at 468-70, 86 S.Ct. at 1624-25. "If the individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." 384 U.S. at 473-74, 86 S.Ct. at 1626-27. An accused can waive the right to remain silent or to consult with an attorney, provided that the waiver is knowingly, intelligently, and voluntarily made. 384 U.S. at 444, 86 S.Ct. at 1612. The test to determine whether a waiver was voluntary is the totality of the circumstances surrounding the interrogation, which includes the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials. The inquiry as to whether the waiver was knowingly, intelligently, and voluntarily made has two distinct dimensions:
"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the `totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."
Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).
Based on the above standard, we conclude that Gospodareck validly waived his right to remain silent and his right to the presence of counsel. Therefore, the voluntariness of Gospodareck's waiver is not at issue. Gospodareck comprehended the full panoply of rights set out in the Miranda warnings and the possible consequences of a decision to relinquish those rights. We agree with the following statement of the majority in Moran v. Burbine, 475 U.S. at 422, 106 S.Ct. at 1141:
"Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."
Thus, we follow the lead of the United States Supreme Court in interpreting the reach of that Court's Miranda rule:
"We are unwilling to modify Miranda in a manner that would so clearly undermine the decision's central `virtue of informing police and prosecutors with specificity ... what they may do in conducting [a] custodial interrogation, and of informing courts under what circumstances statements obtained *846 during such interrogation are not admissible.' Fare v. Michael C., [442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)]."
Moran v. Burbine, 475 U.S. at 426, 106 S.Ct. at 1143.
For the foregoing reasons, we affirm the judgment of the Court of Criminal Appeals, which held that the events surrounding Gospodareck's arrest did not invalidate his waiver of his right to remain silent and his right to counsel.
AFFIRMED.
MADDOX, ALMON, HOUSTON, INGRAM, and BUTTS, JJ., concur.
COOK, J., dissents.
COOK, Justice (dissenting).
I respectfully dissent. In affirming, the majority gives countenance to egregious behavior by law enforcement officials that violates the Due Process Clause of the 14th Amendment to the United States Constitution.
Gospodareck was arrested on February 9, 1991, at 7:00 a.m., for the murder of Jerry Callahan. He was taken from his home to the Hoover jail after being informed of his rights. Gospodareck v. State, 666 So.2d 835, 839 (Ala.Crim.App.1993). By 9:00 a.m., Gail Gospodareck, the defendant's wife, who claims that she was not told that he would be taken to the Hoover jail, began making telephone calls in an attempt to locate her husband. Mrs. Gospodareck claims that her telephone calls to the jail were not returned by jail officials and that she was unable to ascertain his whereabouts.
In its opinion, the Court of Criminal Appeals stated:
"It is clear from the testimony and from the transcripts of the telephone records of the jail, that jail personnel were under the impression that they were not to disclose that the appellant was being held. The appellant's wife testified in the suppression hearing that she first contacted the jail around 9:00 a.m. She testified that she telephoned the jail several times and left messages but that none of her telephone calls were returned. She testified that during the course of some of these calls, she inquired of the person who answered the telephone about the appellant's whereabouts and specifically asked if he was in the jail. The person that spoke with her told her that he could not provide that information and that she would have to speak with one of the investigating officers. She went to the jail around 1:00 p.m., but she was not allowed to see the appellant. She said that at that time the police finally acknowledged that the appellant was being held but that they would not allow her to see him. At one point, she was informed that the appellant was not allowed any phone calls or visitors. She then contacted Gayle Gear, an attorney.
"Gear testified that she telephoned the Hoover jail and asked if the appellant was being held there. The person she spoke with told her that he did not have the authority to disclose that because he said he had to determine if he could tell her whether the appellant was being held there. When she telephoned again, this person explained that he had not been able to determine whether he could release that information. Gear informed Richard Storm, an attorney in her office, of the situation.
"Storm then telephoned the Hoover jail. Whoever he spoke with would not reveal whether the appellant was being held there. Storm went to the jail around 5:00 p.m. He inquired whether the appellant was being held. Initially he was told by jail personnel that they did not know if the appellant was in custody. Upon further inquiry, he was told that he would have to speak with Detective Braden. Storm testified that over the course of 4 hours he asked to speak with the appellant approximately 20 times. Eventually, he spoke with Detective Braden. Storm testified that he asked Braden to inform the appellant that he was there and to tell him not to make a statement without Storm's being present. Braden informed Storm that because the appellant had not requested an attorney Storm could not see him. Storm then asked Braden to tell the appellant *847 that he was there; Braden indicated that he would. The appellant was eventually informed that an attorney was at the jail to see him. He was informed of this after he had given his oral confession and before his written statement had been obtained."
Gospodareck, supra, at 839-40.
The majority finds that the confession Gospodareck made to police investigators after being held incommunicado in the Hoover jail from 7:00 a.m. until 9:00 p.m. was not erroneously admitted at trial. I disagree. The majority, in relying on Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986), failed to note that the Supreme Court also stated:
"Finally, respondent contends that the conduct of the police was so offensive as to deprive him of the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment. Focusing primarily on the impropriety of conveying false information to an attorney, he invites us to declare that such behavior should be condemned as violative of canons fundamental to the `"traditions and conscience of our people."` Rochin v. California, 342 U.S. 165, 169 [72 S.Ct. 205, 208, 96 L.Ed. 183] (1952), quoting Snyder v. Massachusetts, 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674] (1934). We do not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation."
Moran v. Burbine, 475 U.S. at 432, 106 S.Ct. at 1146. The facts of this case are indeed more egregious than the facts of Moran. Two analyses of Moran and the alleged police misconduct there explain why Gospodareck's argument that he was denied due process guaranteed by the 14th Amendment should not have been so quickly dismissed by the Court of Criminal Appeals or by the majority of this Court.
"The United States Supreme Court often grants a writ of certiorari in order to harmonize and enhance consistency in conflicting areas of constitutional law. If this was the motive behind the decision to hear Burbine, the Court unfortunately failed to resolve the conflict surrounding the breadth of suspects' constitutional rights during interrogation. The Court has merely shifted the analysis in these cases from the fifth amendment to the fourteenth amendment due process clause.
"The Court determined that police deception of an attorney and/or their subsequent refusal to inform the suspect of the retained attorney's desire to represent him does not violate a suspect's fifth amendment rights. However, when confronted with the question of how such police conduct impacts upon the fourteenth amendment due process right of suspects, the majority stated that it would `not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation.' The Court would require that police misconduct `shock the sensibilities of civilized society' before such conduct constitutes a due process violation.
". . . .
"Rather than clarifying an ambiguous area of law, the Burbine decision raises additional questions regarding the scope of custodial suspects' constitutional rights. Consequently, the decision most likely will not significantly reduce the amount of litigation in this area...."
Moran v. Burbine: Constitutional Rights of Custodial Suspects, 34 Wayne L.Rev. 331, 349-51 (1988). (Footnotes omitted.)
"[T]he deliberate deception of a potential defense attorney is a matter of police misconduct, and the punishment of the misbehavior of law enforcement officials has traditionally been left to the fourteenth amendment. Burbine was not coerced into incriminating himself. He made his statements voluntarily after knowingly signing waivers of his constitutional rights. Burbine also was not denied his right to counsel. He voluntarily waived his right to counsel after the police explicitly informed him of it. Burbine was subjected to unethical police behavior, and the fourteenth amendment is the appropriate source of authority to curb such official misconduct."
A Missed Opportunity to Curb Police Deception of Criminal Defense Attorneys, Moran v. Burbine, 106 S.Ct. 1135 (1986), 25 American *848 Criminal L.Rev. 89, 106, at 111 (1987). (Footnotes omitted.)
Gospodareck's wife began calling at approximately 9:00 a.m. She testified that she called the Hoover jail repeatedly in an attempt to ascertain whether her husband was there. R.T. at 219. She further testified that she left messages, but that her calls were never returned. R.T. at 218. Between 1:00 and 1:30, Mrs. Gospodareck testified, she went to the Hoover jail and was finally told that her husband was, in fact, being held in the jail, but that she could not see him. R.T. at 220. She testified:
"Q. Did you verify whether or not your husband was even there?
"A. He did say at that time that he was there.
"Q. And did you askmake any inquiry as to whether you could perhaps talk to him by telephone?
"A. Well, when I called back I called another number to the jail. And they said that he was not allowed any phone calls. And so I asked if he could call me back, and he said he was not allowed any phone calls and no visitors. It was on some kind of board or something...."
R.T. 220. At 2:00, she telephoned Gayle Gear, an attorney, to request that she represent her husband. Gear telephoned the jail more than once and was told that she could not be given information regarding Gospodareck. At approximately 4:15 p.m., Richard Storm, an attorney working with Gayle Gear, began calling the jail. Storm arrived at the Hoover jail at approximately 5:00; he remained there until 9:00, without being allowed to see the defendant. Storm testified that "at least 20 times" he requested to see Gospodareck. R.T. 205. In fact, Storm specifically requested that Gospodareck be informed by Sergeant Braden, a police official, of Storm's presence at the jail. Storm asked Braden to tell Gospodareck not to make any statements without his attorney being present. Sergeant Braden told Storm that he would tell Gospodareck that there was an attorney at the jail to see him; he nevertheless did not so inform Gospodareck until almost two hours later, after Gospodareck had made a confession. While Storm was at the jail attempting to see Gospodareck, William Dawson, another attorney in the office, also made several telephone calls to the jail and was unable to ascertain any information from the police officials regarding Gospodareck.
The telephone records of the jail indicate that while Gospodareck was being held at the jail the police officials deliberately hampered Mrs. Gospodareck's attempts to find out where her husband was being held and deliberately refused repeated attempts by Mr. Storm, who was hired by Mrs. Gospodareck, to see him. In addition, posted instructions in the jail indicated that the defendant was to receive no telephone privileges.[1] Jail officials had dressed Gospodareck in ill-fitting clothes and, during his interrogation made reference to "the gas chamber" on more than one occasion. The gas chamber is not the method of execution in Alabama. Although for almost three hours Gospodareck denied killing Callahan, he eventually confessed. Following his confession, he was told that an attorney was waiting to see him.
Following the release of Moran v. Burbine, a commentator made the following observation:
"Law enforcement officials might infer from the [Moran] decision that they can he to attorneys in order to isolate suspects for extended incommunicado interrogation without hindering their ability to obtain valid confessions."
A Missed Opportunity to Curb Police Deception of Criminal Defense Attorneys, Moran v. Burbine, 106 S.Ct. 1135 (1986), 25 American Criminal L.Rev. 89, 106 (1987). That appears to be exactly what happened in this instance.
"It seems evident that society should not condone police tactics designed to intentionally deceive an officer of the court. In a sound criminal justice system, those authorized to enforce the law should not have to resort to deceit, trickery, or blatant lies in order to convict the guilty. Attorneys have an important role in our criminal *849 justice system that should not be thwarted by insidious police knavery."
Moran v. Burbine: Constitutional Rights of Custodial Suspects, 34 Wayne Law Review 331, 355. (Footnotes omitted.) While any one incident cited by Gospodareck might, in and of itself, not rise to the level of a due process violation, collectively considered, the actions of the police officers in this case indicate that the officers clearly set out to seclude Gospodareck and to intimidate him into confessing to the murder of Jerry Callahan. Therefore, because I think Gospodareck's confession should not have been admitted at trial, I dissent.
NOTES
[1] "No PX" was written on the board in the jail. This meant "no telephone."